PAMELA JILL CASEY, Plaintiff-Appellant, *v.* THAD W. PENN, Defendant-Appellee.

Second District (1st Division)    No. 74-400

Opinion filed February 4, 1977.—Supplemental opinion filed on denial of rehearing May 12, 1977.°

° The supplemental opinion is published at 45 Ill. App. 3d 1068.

Herbert F. Stride and William J. Harte, both of Chicago, for appellant.

Edward A. Puisis and Robert L. Snook, both of Hall, Meyer, Fisher, Holmberg, Snook & May, of Waukegan, for appellee.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

The plaintiff, Pamela Jill Casey, a minor, by her father and next friend Hearl Casey, brought this action against the defendant, Dr. Thad W. Penn, as a result of the alleged negligent medical treatment of the plaintiff which resulted in the amputation of her left arm below the elbow. In a

jury trial a verdict was returned in favor of the defendant and the judge entered judgment thereon.

On appeal the plaintiff has presented four issues for review: (1) whether the verdict was against the manifest weight of the evidence; (2) whether the trial court committed reversible error by refusing to admit a hospital laboratory report into evidence identified as Plaintiff's Exhibit 9 and by refusing to allow the plaintiff to cross-examine Dr. Penn with regard to it; (3) whether the trial court committed reversible error in striking part of the plaintiff's amended complaint regarding the consent and limiting examination of certain witnesses on this point; and (4) whether the trial court created prejudicial error by allowing the jury to deliberate past 3 a.m., one hour beyond the time the jury was to be dismissed by stipulation.

The record reveals that on June 4, 1967, the plaintiff, Pamela Jill Casey, aged 15, fell from a pony and seriously injured her left arm. Her father took her to St. Therese Hospital in Waukegan, Illinois, where she was examined by Dr. Max Z. Cahan, the family physician. Dr. Cahan called in the defendant, Dr. Penn, an orthopedic surgeon, as a consultant. Dr. Penn suggested that the broken arm be reset by a surgical method known as open reduction. On June 5, 1967, Dr. Penn, assisted by Dr. Cahan, reset Pamela's arm by that surgical technique. During the next five days the plaintiff's arm remained swollen and immovable, there was seepage from the site of the incision and her hospital room began to acquire a foul odor. On June 10, 1967, the results of the laboratory tests were examined by Dr. Penn and it was determined that the arm had become gangrenous. After efforts to remove the gangrenous tissue and to arrest the infection proved unsuccessful, it was determined on June 26, 1967, that the arm had deteriorated to such an extent that amputation was necessary. On June 30, 1967, defendant amputated plaintiff's arm below the elbow.

Plaintiff's first contention, that the verdict is against the manifest weight of the evidence, is two-fold. Plaintiff argues that the evidence of defendant's negligence was clearly established on two points: (1) defendant's decision to employ an open reduction procedure and the complete lack of an initial examination of the plaintiff's arm; and (2) the improper post-operative treatment of plaintiff by Dr. Penn. In light of the fact that we agree with the plaintiff's latter argument, we find it unnecessary to pass upon the former. Thus, this part of the opinion shall be limited to the question of whether the verdict, that the defendant was not negligent in the post-operative treatment of the plaintiff, is against the manifest weight of the evidence.

■■ In *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32, 36, our supreme court, in reiterating the proper standard to be applied by a court of review in determining the propriety of a trial court's denial of a post-trial motion for a new trial, stated:

> "On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence."

The court in *Mizowek*, after reviewing all the evidence, found the jury's verdict in favor of the defendant was contrary to the manifest weight of the evidence and reversed the case for a new trial on all the issues.

In this case, the evidence of defendant's negligence in the post-operative treatment of plaintiff's condition is clearly evident and we find that the trial court erred in refusing to grant plaintiff's motion for a new trial on this issue.

Dr. Cahan testified that it was the defendant's job to follow the post-operative condition of the plaintiff insofar as the surgery was concerned. Defendant testified that it was necessary to immediately treat the post-operative infection so that the infection would not grow and spread. Defendant stated that an infection, treated or not, can effect the vascular supply to the infected site. He stated that the proper way to treat an infection is to first determine the type, kind and nature of the bacteria. This is done by laboratory tests which involve growing a culture and determining which antibiotics will combat or destroy the bacteria. Another test, known as the smear test, is used to determine in a general way the nature of the bacteria, *i.e.*, gram-positive or gram-negative and spherical, rod-shaped or spiral. Defendant testified that it takes at least 48 hours to get the results from a culture and sensitivity test but that it takes less than 1 hour to get the results from a smear test, which would indicate the general class of drugs which would fight that type of bacteria.

The record reflects that on Monday morning, June 5, defendant, assisted by Dr. Cahan, performed the open reduction surgery on plaintiff's left forearm. Defendant testified that prior to surgery he did notice that plaintiff's arm had started to swell but that he did not consider this to be unusual. After the surgery the defendant placed a compressive bandage on plaintiff's arm to control the swelling and placed the arm in a sling. The defendant testified that when he placed the compressive type bandage on plaintiff's arm he did so with full realization that additional swelling could follow post-operatively and that swelling alone could have the capacity to interfere or embarrass the circulation in the extremity. He testified if the compressive bandage were applied too tightly, it could interfere in even a greater way with the circulation of the arm. Plaintiff's aunt, Jo Ann Cepon, a registered nurse, testified that after the surgery was completed she observed the sling on the plaintiff's arm as being too tight and that it seemed to cramp the arm. She immediately reported this to someone in authority.

On Tuesday, at about 1:45 a.m., the hospital called the defendant to report that the plaintiff was running a temperature of 103°. Defendant ordered that she be given aspirin and sponge baths periodically. He

testified that such a temperature was not unusual because the medicine given her prior to surgery could cause this effect. He admitted that it could have been an indication of infection but felt that it was rather remote so soon. At 6 a.m. the temperature was reduced to 100°, not excessively abnormal, but the plaintiff complained of pain, there was no movement in the arm or hand and the swelling was only moderate. Defendant was of the opinion that the plaintiff "would" not move her hand rather than could not. The bandage had a discharge on it from the surgical wounds but the defendant testified that it was normal to have orthopedic ooze after this type of an operation and did not consider the discharge was infectious. Therefore, defendant did not order any laboratory test on the discharge. Defendant testified that he did order that the plaintiff be given penicillin because he suspected that she might be getting an infection and used an educated guess that it was a staphylococcus organism against which penicillin is highly effective. However, it should be noted that the plaintiff complained on that day of a foul odor in her room that was very stale and sickening which the nurses' assistant tried to cover up with a deodorant.

On Wednesday, June 7, at 8 a.m. the plaintiff's temperature was 100°. On this day the defendant did not visit plaintiff. Dr. Cahan testified that he visited the plaintiff that day. He observed that plaintiff had a temperature above normal, complained of pain, had drainage on the bandage and that the arm had a foul odor. Dr. Cahan also knew that plaintiff had been wandering from her bed and having bowel movements and urinating on the floor. It was Dr. Cahan's opinion on that day that plaintiff's left arm was infected in the area of the surgical site. Dr. Cahan testified he did not inform defendant of his opinion. Dr. Cahan left for a week's vacation that day and had no reason to believe that the defendant was not following plaintiff's post-operative condition as closely as Cahan was. Dr. Mauer, defendant's associate, did visit the plaintiff on June 7 and examined her arm. He recorded his observation that there was no movement but color and circulation was good. At the trial he testified that he had seen the charts on the plaintiff and had read Dr. Cahan's observation earlier that day, specifically that there was an odor from the left arm. Dr. Mauer felt the odor was from the dried blood on the bandage. That afternoon Dr. Mauer did orally give instructions to reinforce the bloody dressing and to call him if the drainage continued. At 11 a.m., when the plaintiff's mother visited her, the mother noticed the offensive odor and that the stains on the bandage were larger and were on the pillow upon which the arm was resting. That afternoon Jo Ann Cepon visited the plaintiff and observed the same. In her opinion, as a registered nurse, the odor was a sign of infection. She also noted that the plaintiff's fingers were slightly cold and had a somewhat bluish discoloration. She reported her observations to the nurse on duty and asked that the

bandage be changed. The nurse changed the outside Ace bandage but not the surgical dressing. When plaintiff's father visited her that night he observed the fingers were swollen and that the bandage and pillow were stained by the drainage. At 11 p.m. Dr. Penn, in a telephone conversation with the plaintiff's mother, explained that the offensive odor was from the dried blood. No laboratory tests were ordered that day.

Thursday, June 8, plaintiff's condition remained the same. Defendant changed the surgical dressing on plaintiff's arm for the first time and discovered that there was edema (swelling) of the arm and pus at the surgical site. This left no doubt in his mind that the arm was infected. Defendant ordered a laboratory test for the infection, knowing that it would take the lab at least 48 hours to grow a culture of the bacteria. A smear test was also done by the lab that day, the results of which indicated the plaintiff was infected with a gram-negative rod-shaped bacteria. Defendant testified that he did not see the report of the smear test results until two days later, on June 10, although he was aware that it took less than one hour to make one. Defendant ordered that plaintiff be given hot, wet pack compresses and continued on penicillin. Penicillin normally has no effect on a gram-negative bacteria.

Jo Ann Cepon testified that on either Thursday, June 8, or Friday, June 9, she had a conversation with the defendant in which he indicated to her that the plaintiff was suffering from an aerobic bacteria. She told the defendant that she was sure that the plaintiff's parents did not know and that someone should tell them.

Friday, June 9, the defendant was informed plaintiff had suffered involuntary bowel movements and other complications that day, showing failing health. Her temperature was 101°. Defendant testified that while the swelling was less and the skin remained warm, there was no movement in the arm. Plaintiff's father testified that defendant told him in a telephone conversation that day that her condition was good and that she would be getting out of the hospital in about 10 days.

On Saturday, June 10, defendant received the results from the culture and sensitivity tests which indicated that plaintiff had an aerobacter aerogenes bacteria that was gram-negative. He transferred plaintiff to the intensive care unit and examined her arm with Jo Ann Cepon. Cepon testified that the arm had an open wound that extended from the wrist to the elbow which was several inches wide. The tissue was eaten away (necrosis, a form of gangrene), and the bone was partly exposed. The wound contained drainage fluid filled with blood, the arm was swollen and the fingers were slightly bluish in color and cold to the touch. Defendant denied that the bone was exposed or that the hand was bluish and cold but admitted that there was an area of about 2½″ in diameter of necrotic tissue at the surgical site. Defendant then stopped the penicillin

procedure and started her on a chloromycetin 4 times a day and an irrigation with antibiotic solution of mycifradin.

On June 12 the necrosis had progressed to a greater degree, covering a larger area, which defendant attributed to the lack of blood in the arm. Since the plaintiff had been without fever for three days, the defendant ordered that a debridment of the skin (stripping away the dead skin) be done. The debridment was done by the defendant on June 13, but he was unable to arrest the necrosis. On June 15 the arm was not responding to the treatment and defendant testified that, because the skin was still warm, had good color and would bleed when cut, there was great deception in diagnosing the problem. That day plaintiff was taken out of intensive care. Plaintiff's condition continued to worsen. The necrosis progressed and the chloromycetin was ineffective in controlling it. Other orthopedic surgeons were consulted and another debridment was done by the defendant. During the operation on the 26th the defendant discovered that there was no longer a blood supply to the arm and the forearm was a mass of necrotic tissue with nothing salvageable. Thereafter the left forearm was amputated below the elbow by the defendant on June 30.

When asked if he attributed the spreading of the necrosis to a spreading of the infection or some other cause, defendant testified that he related it to an impaired blood supply to the skin which was caused by the edema. When questioned about the cause of the edema, defendant indicated that it was caused by the trauma of the fall and the surgery. Defendant felt that the embarrassment to the circulation of the arm could have been caused by the edema and complicated by the compressive type bandage; however, defendant said that he was not stating that this was the actual cause. Defendant had previously pointed out that an infection, whether treated or not, can affect the vascular supply of the infected site. No other reasons were offered to explain the cause of the embarrassment to the circulation of the arm.

The evidence clearly shows defendant knew that the threat of infection is always present when surgery is performed and the necessity to treat post-operative infection immediately so that it will not grow and spread. Defendant also knew about the danger of loss of circulation to the arm after the surgery. Defendant was aware of the possibility of edema from the fall and surgery causing the loss of circulation and the possibility of either or both the compression bandage or an infection interfering with the circulation to the surgical site. However, the defendant did not consider the possibility of these complications when obvious signs of infection and lack of circulation in the arm occurred.

Prior to surgery defendant acknowledges that plaintiff's arm had started to swell or puff up. He knew that there would be swelling from

the surgery. Defendant went ahead with the surgery and placed a compressive type bandage on the arm which threatened to cut off circulation to the surgical site. The night after surgery defendant knew plaintiff was running a temperature. He did not consider infection treatment but merely instructed the nurses to give her aspirin and sponge baths. The day after the surgery she still had a temperature, her arm was moderately swollen, she complained of pain and could not move her arm. That day he considered she might be getting an infection and prescribed penicillin, using an "educated guess." Defendant did not look at the surgery site nor order any tests or X-rays done. However, Dr. Cahan did order a chest X-ray after hearing about the plaintiff's temperature because he suspected that an infection had set in. The negative report on the chest X-ray was in the plaintiff's file on Wednesday. Defendant did not visit the plaintiff that day because it was his day off. He delegated his duties to Dr. Mauer, his associate. Dr. Mauer did visit the plaintiff Wednesday after Dr. Cahan had. Dr. Mauer knew that the X-ray showed no infection in the chest, that Dr. Cahan had detected a foul odor from the left arm, that plaintiff was running a temperature, that she was wandering from the bed in the night and having bowel movements and urinating on the floor, that her arm was swollen, that there was a great deal of discharge on the bandage, that she could not move her arm and that she was in pain. However, he did not order any tests for infection. Dr. Cahan felt that there was an infection in the plaintiff's arm at the surgery site but, because it was the defendant's responsibility to follow up on the post-operative condition of plaintiff as far as surgery was concerned, and since he had no reason to believe that the defendant was not on the job that day, he did not inform the defendant on that day of his views. Also, Dr. Cahan left town that day to go on vacation.

Thus, not until Thursday, June 8, four days after the operation, did the defendant examine plaintiff's surgical site. That day he was able to tell that there was an infection in the surgical wound and he ordered laboratory tests and a continuation of penicillin. He did not check back with the lab until two days later for the results of the tests because he knew it took that long for a culture to grow and sensitivity tests to be made. Defendant admitted that he could have received a smear test report within an hour from the time that the sample was taken. A test of that type was run and the results indicated that the bacteria was a gram-negative type, against which penicillin was ineffective. The defendant did not admit knowing about the type of infection or giving medication which would combat the bacteria, aerobacter aerogenes (gram-negative), until June 10. Defendant's failure to review the smear test until June 10 allowed the infection to grow an additional two days before proper medication was given to combat the infection. By June 10 the necrosis was 2½″ in diameter at the surgical site and plaintiff was transferred to the

intensive care unit. Not until that day was the compressive bandage removed and the embarrassment to the circulation treated in any manner. Despite that treatment, basically undoing the prior treatment, plaintiff's arm continued to deteriorate and was subsequently amputated below the elbow.

In other words, defendant neglected to inspect the surgical wound for four days after the operation despite indications of infection or threat of embarrassment of circulation. The defendant refused to consider an infection in the surgical wound until two days after the surgery, at which time he merely guessed that there might be an infection but did not take any tests to determine what type of bacteria was infecting the plaintiff. On June 7 defendant delegated his responsibilities to Dr. Mauer, who did not diagnose or discover the infection that day. Furthermore, on June 8, when faced with the reality that the arm was indeed infected, defendant did order tests but neglected to follow up that day to determine if the smear test indicated that the penicillin he was prescribing was ineffective.

The evidence clearly shows the serious danger from the loss of circulation to the surgical site. It is also clearly evident that the defendant proceeded to operate on the plaintiff's arm while the edema from the fall was effecting the surgical site, knowing that the trauma from the surgery would increase the edema in that area and that alone could cause embarrassment of circulation to the arm. Defendant further placed a compressive bandage to control the edema and refused to consider infection on the surgical site, both of which threatened to embarrass the circulation even further. Even after it was obvious that the circulation of the arm was seriously impaired, the defendant failed to take affirmative steps in order to improve circulation to the arm. In light of the evidence that the procedures followed by the defendant significantly contributed to the embarrassment of the circulation to the arm and his failure to take affirmative steps to cure the obvious danger to the arm, resulting in the necrosis and eventual amputation, the verdict of the jury is clearly contrary to the manifest weight of the evidence and a new trial is granted on this issue.

Plaintiff's second contention is that the trial court committed prejudicial error in refusing to admit plaintiff's exhibit 9, the smear test report dated June 8, 1967, and refusing to permit cross-examination of Dr. Penn with respect to the contents of that exhibit. Plaintiff argues that her hospital chart was utilized freely throughout the entire trial and that exhibit 9 was the only document to which there was a challenge in the entire record. Plaintiff concludes that at the very minimum the trial court should have permitted the use of plaintiff's exhibit 9 in cross-examination.

Supreme Court Rule 236(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 236(a)) provides that a business record which qualifies shall be admitted into evidence without introducing all other circumstances of its making. The

rule provides that such circumstances merely affect its weight, not its admissibility. Rule 236(b) provides:

"This rule does not apply to the introduction into evidence of medical records or police accident reports."

The Committee Comments, in pertinent part, with regard to the interpretation they intended for Rule 236(b), provide:

"Paragraph (b) of rule 236 provides that the *law governing admissibility of medical records* and police accident reports *is not affected by this rule.*" (Emphasis added.) Ill. Ann. Stat., ch. 110A, par. 236, Committee Comments (Smith-Hurd 1968).

■■ We find that it was the intent of the drafters of Supreme Court Rule 236 that the adoption of the rule would in no way affect the common law business records exception to the hearsay rule as previously developed in Illinois as it applied to medical records and police accident reports. An examination of the case law in this area reveals some confusion over what the law with regard to the admissibility of medical records was prior to Rule 236. Our Supreme Court has considered this issue on five occasions: *Wright v. Upson* (1922), 303 Ill. 120, 144, 135 N.E. 209, 218; *Kimber v. Kimber* (1925), 317 Ill. 561, 573, 148 N.E. 293, 297; *Flynn v. Troesch* (1940), 373 Ill. 275, 282-83, 26 N.E.2d 91, 95; *People v. Wallace* (1966), 35 Ill. 2d 620, 622-23, 221 N.E.2d 655, 657; and *People v. Jackson* (1968), 41 Ill. 2d 102, 113-15, 242 N.E.2d 160, 166. In *Wallace* the defendant argued the issue but the supreme court held that it was not necessary to pass on it.

In *Wright* the supreme court said that a hospital medical record, if admissible at all, would come in under the business records exception to the hearsay rule upon the laying of a proper foundation. In *Kimber* the court said that such a record was admissible under the business record exception upon the laying of a proper foundation. In *Flynn* the court held that where the testimony of the nurses who made the entries in the medical records in question was in conflict with each other and where in some instances their testimony was in conflict with their own statements made at an earlier trial, it was not error for the trial court to exclude such records. *Flynn* merely established that when the testimony of the foundation witnesses is not convincing it is proper for the trial court to exclude such records. In *Jackson* defendant argued it was reversible error to admit in evidence his county jail inmate card because it contained a medical record. The court held that the card, which among other information contained medical notations describing defendant's physical health, was not a medical record for purposes of Rule 236(b) and was, therefore, admissible under Rule 236(a).

Rule 803.6 of the Federal Rules of Evidence provides that records kept in the course of a regularly conducted business activity, including a "* * * business, institution, association, profession, occupation and

calling of every kind, whether or not conducted for profit" are not excluded by the hearsay rule. The House Committee Report states that this phraseology was used to make it clear that the medical records of hospitals, among others, were to be admissible under this rule. The State of Illinois has, of course, not adopted the Federal Rules of Evidence, but this is indicative of current thinking on this issue. As is stated in McCormick's Handbook of the Law of Evidence (2d ed. 1972), at page 730:

> "In some jurisdictions, specific statutory authority for the admission of hospital [medical] records exists. Although some courts in other jurisdictions initially hesitated to expand the business record exception to noncommercial establishments such as hospitals, all would concede today that hospital [medical] records are admissible upon the same basis as other regularly kept records."

While the wording of Supreme Court Rule 236(b) may have caused some confusion in the minds of the courts as to the admissibility of medical records we are of the opinion that this rule allows the admission of hospital medical records where a proper foundation is laid. This is to be differentiated from the provisions of Rule 236(a) where it is provided that a business record kept in the regular course of business is admissible but that the circumstances of the making of the entry may be shown to affect its weight, not its admissibility. In this we disagree with that part of the opinion which may be interpreted to the contrary in *People v. Aristole* (1971), 131 Ill. App. 2d 175, 181, 268 N.E.2d 227, 231, where the court stated that the medical records in that case were "within the medical records exception to Rule 236 and were therefore properly refused admission by the trial court."

■■■ Having examined the supreme court cases and other appellate decisions concerning this issue, we conclude that this medical record, exhibit 9, the hospital laboratory smear test report, was properly excluded in the case herein for failure to lay a proper foundation.

With regard to the use of plaintiff's exhibit 9 for cross-examination purposes, we note that the plaintiff's attorney questioned the defendant in detail about what a smear test is; the time involved in making the same; what the test could show; when exhibit 9 was made; when defendant first saw it and what its results were. The only questions the court did not allow concerned the hypothetical question of what the defendant might have done differently if he had seen the report on June 8. The trial court's actions in sustaining the objections to those questions were proper. (*Cf. Flynn v. Troesch* (1940), 373 Ill. 275, 26 N.E.2d 91.) We find no error in this regard.

The next contention of the plaintiff is that the trial court committed prejudicial error when it struck, as a matter of law, plaintiff's theory of

negligence on the part of the defendant for his failure to obtain an informed consent to the operation. Mrs. Casey, the mother of the plaintiff, did sign the consent which contained a provision for the open reduction of her daughter's forearm. Additionally, she testified at the trial that even if she had known about the open reduction procedure she would have consented. However, the open reduction surgery and the possible after effects were not discussed by the defendant or the family physician with Mrs. Casey before signing the consent. Plaintiff therefore contends that this is an issue that should have been presented to the jury, to-wit: was there an "informed consent" to the surgery. Additionally, plaintiff alleges that the court erred in not allowing plaintiff the opportunity to present witnesses or evidence in this regard.

In support of this argument, the plaintiff argues that to make the consent meaningful the consent must be obtained by the chief surgeon or physician in charge of the case and that, at the very minimum, the doctor should explain the physician's diagnosis, the general nature of the proposed treatment, the risk involved in the proposed treatment, the prospects of success, the prognosis, if the procedure is not performed, and any alternative methods of treatment.

■■ Defendant responds that plaintiff was not prevented from presenting proper evidence in regard to the issue of consent. Defendant cites *Green v. Hussey* (1970), 127 Ill. App. 2d 174, 184, 262 N.E.2d 156, 161, as the leading case in Illinois dealing with informed consent. In *Green*, the court, in discussing this question, stated that to establish liability for failure of the defendant to obtain an informed consent,

> " * * * plaintiff had the burden of proving by expert medical evidence that the reasonable medical practitioner of the same school, in the same or similar circumstances, would have told the patient of such risks, or that the disclosures as made by the defendants did not meet the standard of what a reasonable medical practitioner would have disclosed under the same or similar circumstances. [Citation.] Also, plaintiff had the burden of proving by expert medical testimony that such failure was the proximate cause of her damage.
>
> In the instant case expert medical testimony was required of plaintiff to make a prima facie case under the 'informed consent' theory. No such evidence was offered by plaintiff, and we hold that the trial court properly directed a verdict in favor of defendants at the close of plaintiff's case."

■■ In the case before us, and following the decision in *Green* with which we concur, we find that the plaintiff failed to present expert medical testimony required to make a prima facie case under the "informed consent" theory and that this issue was properly stricken by the trial court.

■■ Plaintiff's final contention is that the trial court created prejudicial error in allowing the jury to deliberate past 3 a.m., one hour beyond the time the jury was to be dismissed by stipulation. Defendant has filed a motion to strike this issue and argument. We have ordered that the motion be taken with the case. Defendant contends that plaintiff's issue in this instance should be stricken because plaintiff failed to preserve the stipulation in question in the trial court record, her assertion being based solely upon the proceedings surrounding her petition for a new trial. An examination of the record discloses that the plaintiff has failed to preserve this question for review, there being nothing in the record to support this issue, the defendant's motion to strike is granted. *Hoffman v. Wilson* (1965), 60 Ill. App. 2d 396, 208 N.E.2d 607.

The order of the trial court denying plaintiff's motion for a new trial is reversed and the case is remanded for a new trial.

Reversed and remanded.

SEIDENFELD, J., concurs.

Note: The supplemental opinion in this case appears beginning on page 1068.