**ESTATE OF Dale H. SMITH By and Through Belle L. SMITH, executor, Appellant,**

v.

**Ernest N. LERNER, M.D., and the Henry County Soldiers and Sailors Memorial Hospital d/b/a Henry County Health Center, Appellees.**

No. 84–1087.

Supreme Court of Iowa.

May 21, 1986.

Lex Hawkins of Hawkins & Norris, Des Moines, and Thomas J. Vilsack of Bell & Vilsack, Mt. Pleasant, for appellant.

Robert V.P. Waterman and Robert V.P. Waterman, Jr. of Lane & Waterman, Davenport, for appellee Ernest N. Lerner, M.D.

Richard M. Tucker, of Phelan, Tucker, Boyle & Mullen, Iowa City, for appellee Henry County Soldiers and Sailors Memorial Hospital d/b/a Henry County Health Center.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, CARTER, and LAVORATO, JJ.

LAVORATO, Justice.

After trial to a jury, the district court entered judgment for the defendants, Dr. Ernest N. Lerner and the Henry County Health Center, in this medical malpractice action for the death of Dale H. Smith. The evidence at trial produced two theories on the cause of death. According to the plaintiff, Belle L. Smith, it was due to the decedent's toxic reaction to a dangerous drug and the subsequent failure to properly administer cardiopulmonary resuscitation (CPR). According to the defendants, the drug was safe and effective, and a massive heart attack caused death, which occurred despite their best efforts of prevention and revival.

The court of appeals affirmed the judgment of the district court. On further review, the plaintiff argues the district court erred in refusing to instruct the jury on her claim that the defendant physician abandoned treatment of her husband, the decedent. *See* Iowa R.Civ.P. 196. She also

argues the court erred in giving an instruction on the defendants' decisions to employ particular methods of treatment in caring for her husband. She requests a new trial, which the district court denied. *See* Iowa R.Civ.P. 244. We affirm the judgment of the district court and the decision of the court of appeals.

Dale Smith was forty-eight-years old at the time of his death and had no previous health problems. He was the owner of a grain elevator in Trenton, where he and his family resided. One morning at his office desk he experienced a burning pain in his chest. He telephoned his wife, and asked her to take him to the health center.

Mrs. Smith met her husband at their house. Although he was feeling better, and the pain in his chest had ceased, they decided to drive eleven miles to Mount Pleasant to see their physician. Upon arriving in Mount Pleasant, however, they were informed that this physician was not available, and a receptionist referred them to Dr. Lerner.

Dr. Lerner briefly examined Mr. Smith, who described his earlier chest pain. Dr. Lerner ordered an electrocardiogram (EKG) for Mr. Smith, but its results did not indicate any abnormality. Unable to determine the cause of the pain, Dr. Lerner advised Mr. Smith to relax that day at home, and to telephone if the pain returned. Mr. Smith followed this advice, except when he returned to the elevator to start the dryer.

That evening Mr. Smith complained his shoulders were sore. He went to bed around 10:30, but an hour later he was awake and experiencing a burning pain under his arms. Mrs. Smith telephoned Dr. Lerner, who advised them to go immediately to the health center in Mount Pleasant. En route to the health center, Mr. Smith's pain subsided.

Dr. Lerner telephoned the health center. He instructed the staff to admit Mr. Smith to the coronary care unit (CCU) and to perform another EKG. Dr. Lerner, who resided about three miles, or five to seven minutes by automobile, from the health center, told the staff to telephone him after the completion of the EKG.

The health center admitted Mr. Smith at 12:15 a.m. Dr. Lerner arrived shortly thereafter, spoke with Mr. Smith, who was then "feeling all right," and performed a brief physical examination. Mr. Smith said that the burning pain in his chest had ceased. He added that the pain had spread to his right arm, and had felt like a "squeezing" one.

Dr. Lerner examined the EKG, and, interpreting its results as abnormal, concluded Mr. Smith's condition had changed since that morning. Dr. Lerner suspected that the pain may have been related to a coronary artery disease, and that Mr. Smith might be subject to a heart attack. Dr. Lerner decided that Mr. Smith should remain overnight in the CCU for observation, and that he undergo further tests the next morning. To prevent a heart attack, Dr. Lerner instructed a nurse to immediately inject lidocaine, inject it five minutes later, and then begin an intravenous flow of a diluted solution of the drug.

Dr. Lerner then informed Mrs. Smith that although he did not believe her husband was having a heart attack, he was being kept overnight for observation and further tests. Dr. Lerner then left the health center.

Around 12:50 a.m. the nurse began the lidocaine drip. Eight minutes later Mr. Smith demonstrated two side-effects of lidocaine: he was drowsy, and his speech became slurred. The lidocaine was discontinued at that time. Around 1:00 a.m., Mr. Smith experienced a seizure, which lasted two minutes, and then he began to turn blue in color. Dr. Lerner was telephoned, and informed of Mr. Smith's seizure. He responded he would immediately return to the health center.

Mr. Smith's heart rate lowered, and by 1:03 a.m. his heart had stopped. In response, the staff administered CPR and electrical shocks. Dr. Lerner, who was preparing to leave for the health center, was telephoned a second time, and in-

formed of the heart stoppage. Around 1:12 a.m., roughly ten minutes after he had received the first telephone call, Dr. Lerner arrived at the health center. More CPR, lidocaine, and electrical shocks were administered, but Mr. Smith was not revived.

## I. *Abandonment.*

■ If there was substantial evidence to support the plaintiff's claim, the jury should have been instructed on the issue of abandonment. *See, e.g., Feldhahn v. RKB Quality Corp.*, 356 N.W.2d 226, 230 (Iowa 1984). We give the evidence "the most favorable construction it will reasonably bear in favor of the party urging submission." *Miller v. International Harvester Co.*, 246 N.W.2d 298, 301 (Iowa 1976).

The abandonment of, and the lack of diligence in, patient treatment are separate theories of medical malpractice:

> Abandonment ... in its classical sense, involves an intent on the part of the physician to terminate ... the contractual relationship. However, closely related to it is the situation in which there is no such intention by the physician, but he is so dilatory in his obligation that he does not see the patient as often as due care in treatment would demand and the patient is thus denied the benefit of the physician-patient relationship. To further differentiate, classical abandonment gives rise not only to an action for negligence, but one for breach of contract. Malpractice involving treatment which results either from failure to see the patient sufficiently often or from an incorrect conclusion that the patient's condition is such that no further treatment is necessary involves an action in negligence alone.

A. Holder, *Medical Malpractice Law* 374 (1978) (footnotes omitted). Nevertheless, in the gray waters of medical-malpractice actions, these two theories are often indistinguishable:

> Refusal to attend to a patient's needs even though the physician may not have made any express declaration to the effect that he does not intend to see the patient further may also be considered abandonment. . . . if the physician fails to see the patient at intervals necessary for proper treatment.

> \*     \*     \*     \*     \*     \*

> Therefore the simple failure to see a patient when necessary may, in the first place constitute abandonment, and in the second it may be negligence in terms of the standard of care of both diagnosis and treatment owed to the patient. If the physician had been properly attentive he might well have known what was wrong with the patient and treated it properly. Thus, even if a physician comes back to see the patient, if he has unreasonably refused to come at the time when the patient needs him, he may well have been so negligent as to be held to have abandoned his patient. The longer the delay, of course, the more likely that a court will find abandonment.

> \*     \*     \*     \*     \*     \*

> The principle involved is that the patient has the right to expect that his doctor will keep himself informed as to the patient's condition, which he cannot do if he removes himself from the case without notice or does not visit the patient frequently enough to be aware of what is happening.

*Id.* at 376, 377 (footnotes omitted). Thus, what distinguishes abandonment from failure to meet the pertinent standard of care is that it requires an intent to terminate the professional relationship.

We have recognized that a physician is liable for abandonment in *McGulpin v. Bessmer*, 241 Iowa 1119, 1127, 43 N.W.2d 121, 125 (1950). In *McGulpin*, a physician informed his patient that it was necessary to amputate his foot "right away." The patient, however, was left in a hospital for over five days without the physician or his superiors seeing or treating his condition. Eventually, the patient transferred to another hospital, and because of gangrene, his leg was amputated. He then brought an action for medical malpractice. We held that the district court erred in not submit-

ting the issue of abandonment to the jury, even though the physicians had not stated they were terminating their relationships with him. *Id.* at 1126, 43 N.W.2d at 125. There was sufficient evidence on the intent of the defendants to abandon the plaintiff with the statement that immediate treatment was necessary, and their subsequent failure to return to him and administer that treatment.

In this case the plaintiff argues the district court erred in refusing her requested instruction that the defendant abandoned her husband because he left the health center while its staff administered lidocaine to him. The weak link in her argument, however, is the lack of proof. The evidence merely showed that the defendant left the decedent, who appeared to be in stable condition, at the health center, to be monitored by the CCU staff. These personnel had orders that went beyond mere observation: they had been instructed on the emergency treatment of heart patients. And, although the defendant delegated the administration of lidocaine, he prescribed its dosage, and informed the staff that he could be reached at home, which was just minutes away from the health center, in case of an emergency.

These circumstances are markedly different than a physician who waits more than three days to examine a patient after obvious symptoms of infection from an operation, *Casey v. Penn*, 45 Ill.App.3d 573, 4 Ill.Dec. 346, 360 N.E.2d 93, 98, *aff'd*, 45 Ill.App.3d 1068, 6 Ill.Dec. 453, 362 N.E.2d 1373 (1977), simply hangs up the telephone on another physician who informs him of a patient whose condition has become critical, *Johnson v. Vaughn*, 370 S.W.2d 591, 595 (Ky.1963), or refuses to re-examine a patient, in pain with a fractured arm set in a cast, on a Saturday night, *Gamradt v. Du-Bois*, 180 Minn. 273, 230 N.W. 774, 775–76 (1930).

A physician is not required to sit by a patient's bedside in every case, and may, when appropriate, leave orders regarding the treatment of the patient for trained personnel to administer. There are limits to how far the theory of abandonment can be extended. *See generally Alexander's Jury Instructions on Medical Issues* § 3–31, at 122 (1980); Holder, *Medical Malpractice Law, supra,* at 372–97; 1 D. Louisell & H. Williams, *Medical Malpractice* ¶ 8.08, at 8—113–14 (1985); 61 Am.Jur.2d *Physicians and Surgeons* § 236, at 366–67 (1981); 70 C.J.S. *Physicians & Surgeons* § 48(f), at 964–66 (1951); Annot., *Physician—Abandonment of Case,* 57 A.L.R.2d 432, 435 (1958).

We note that the issue whether the defendant should have been present during the administration of lidocaine was presented to the jury through the instruction on proper treatment. Thus, the jury could have found him negligent for prescribing lidocaine, failing to instruct the health center staff on treatment in case of a heart attack, or failing to properly treat the decedent after his attack.

We conclude the district court did not err in refusing to instruct the jury on the issue of abandonment.

II. *Alternative Methods of Treatment.*

■ Testimony at trial reflected a difference of medical opinion on whether it was proper under the circumstances to administer lidocaine, and later, after his seizure, electrical shocks, to the decedent. The plaintiff's experts testified that prescribing lidocaine to a patient was only proper if a heart attack or related problem had occurred. In contrast, the defendants' experts testified that the drug had a prophylactic as well as a therapeutic, value, and its administration was proper to prevent an impending heart attack.

Similarly, the plaintiff introduced evidence that application of electrical shocks by the health center staff would not have benefited the decedent, and that this administration interrupted CPR, damaged the heart, and paralyzed breathing. On the other hand, the defendants' experts testified that it was appropriate to apply electrical shocks, that those shocks could not damage a heart or paralyze breathing, and that the staff properly administered CPR.

The jury was instructed that a physician who is a specialist "is required to exercise that degree of skill and care ordinarily used by similar specialists in like circumstances." It was also instructed that a hospital "is required to exercise that degree of skill and knowledge normally possessed by hospitals ... under the same or similar circumstances." The plaintiff argues the district court erred in then instructing the jury that the defendants did not breach their duty of care to her husband if it determined there were

two or more recognized alternative courses of action which have been recognized by the medical profession or hospitals as proper methods of treatment, and the defendants in the exercise of their best judgment elected one of these proper alternatives.

She claims the instruction, alone and together with others,[1] misstated the law, did not apply to the facts, confused and misled the jury, and unduly emphasized the defense of honest mistake in judgment.

Iowa Rule of Civil Procedure 196 provides that a district court "shall instruct the jury as to the law applicable to all material issues in the case...." Instructions that misstate the law, confuse or mislead, or unduly emphasize issues, theories, or evidence, constitute grounds for reversible error. *E.g., Clinton Land Co. v. M/S Associates, Inc.,* 340 N.W.2d 232, 234 (Iowa 1983); *Mills County State Bank v. Fisher,* 282 N.W.2d 712, 716 (Iowa 1979); *Eickelberg v. Deere & Co.,* 276 N.W.2d 442, 447 (Iowa 1979); *Dickman v. Truck Transport, Inc.,* 224 N.W.2d 459, 464 (Iowa 1974).

Our review is on error. Iowa R.App.P. 4. We begin by noting the general rules regarding jury instructions. A district court has a duty "to instruct with reasonable fullness on pleaded issues supported by substantial evidence." *Clinton Land Co.,* 340 N.W.2d at 234. It is then "free to phrase instructions in its own words so long as the instructions fully and fairly

inform the jury of the issues and applicable law." *Id.* "All instructions must be read together and relate to each other, not piecemeal or in artificial isolation." *Dickman,* 224 N.W.2d at 464. "That an instruction might be worded better does not make it bad." *Hardy v. Rynell,* 282 N.W.2d 134, 137 (Iowa 1979).

Several jurisdictions have concluded a physician is not negligent in selecting among two or more recognized methods in treating a patient. *E.g., Young v. United States,* 574 F.Supp. 571, 581 (D.Del.1983) (Hawaii law); *Arrendale v. United States,* 469 F.Supp. 883, 887 (N.D.Tex.1979) (Texas law); *Harrigan v. United States,* 408 F.Supp. 177, 186 (E.D.Pa.1976) (Pennsylvania law); *Rickett v. Hayes,* 256 Ark. 893, 511 S.W.2d 187, 194 (1974); *Barton v. Owen,* 71 Cal.App.3d 484, 139 Cal.Rptr. 494, 503–504 (1977); *Baldor v. Rogers,* 81 So.2d 658, 660 (Fla.1955); *Haase v. Garfinkel,* 418 S.W.2d 108, 114 (Mo.1967); *Truan v. Smith,* 578 S.W.2d 73, 76 (Tenn. 1979); *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977); *accord, Alexander's Instructions on Medical Issues, supra,* § 3–41, at 134; W. Curran & E. Shapiro, *Law, Medicine and Forensic Science,* 578–79 (1970); Holder, *Medical Malpractice Law, supra,* at 105; 61 Am.Jur.2d *supra,* § 216, at 346–47; 70 C.J.S. *supra,* § 44, at 953.

We do not believe that the district court erred in giving the instruction on alternative methods of treatment. As the court stated in *Barton:*

*[Such an instruction] embodies the notion that differing doctors may disagree in good faith upon what would encompass the proper treatment or diagnosis of a medical problem in a given situation.* Medicine is not a field of absolutes. There is not ordinarily only one correct route to be followed at any given time. There is always the need for professional judgment as to what course of conduct would be most appropriate with regard to the patient's condition. Thus [the instruction] states the rule that

---

1. Including the instructions on standard of care, no guarantee of diagnosis, and honest mistake.

*See* 1 *Iowa Uniform Jury Instructions* ch. 13 (1984).

where there are several methods of approved diagnosis or treatment, which could be made available to a patient, it is for the doctor to use his best judgment to pick the proper one.

139 Cal.Rptr. at 504 (emphasis added); *see Harrigan,* 408 F.Supp. at 186; *Haase,* 418 S.W.2d at 114.

■ Contrary to the plaintiff's assertion, an instruction on a physician's standard of care and one on alternative methods of treatment are not inconsistent:

> The rule that a specialist is held to a higher standard requires of him more learning and more skill, but it does not change one of the basic tenets ... that where more than one mode of treatment is recognized as proper, the doctor is not negligent in adopting any of such modes. More is required of a specialist, but his best judgment is the most that can be expected.

*Harrigan,* 408 F.Supp. at 185 (citations omitted).

We believe that the reasoning of *Barton* and *Harrigan* applies to hospital staffs as well as physicians.

■ The plaintiff argues a physician cannot select a particular treatment without a diagnosis.[2] *See Campbell v. Oliva,* 424 F.2d 1244, 1251 (6th Cir.1970). She concludes that, because the defendant failed to diagnose the decedent's condition, there was no factual basis for the instruction.

Medicine has not reached the stage where a physician may always confidently pinpoint the specific disease or injury of a patient. A diagnosis is simply an opinion, which is more than a mere guess, on the existence of a disease or injury, based upon a patient's symptoms. *See* 26A C.J.S. *Diagnosis* 933 (1956); Webster's Third International Dictionary (1961).

In this case the decedent had undergone two short bouts of pain in one day. There was the possibility that the second one awakened him after he had gone to sleep.

The pain had radiated to his arm, and was a "squeezing" one, which is associated with a heart problem. Moreover, the second EKG appeared abnormal to the defendant. While the defendant had not arrived at any precise conclusion on the decedent's condition, he had "impressions" and "suspicions" the decedent was suffering from coronary artery disease and an impending heart attack. Indeed, he entered this diagnosis in the admitting record, and there was testimony at trial to confirm his opinion. We believe this evidence establishes that the defendant made a diagnosis before ordering administration of lidocaine.

The plaintiff further argues that under the instruction the jury could not find the defendants negligent in selecting improper treatments, so long as they were recognized ones. The instruction, however, did not preclude a finding of negligence due to the mere selection of recognized treatments: the defendants were required *to exercise their best judgment* in selecting them. *See Barton,* 139 Cal.Rptr. at 504. In other words, the jury was instructed that if the defendants had not exercised their best judgment in administering lidocaine and electrical shocks to the decedent under the circumstances, they were negligent.

■ Last, we do not believe the instruction unduly emphasized that a physician is not necessarily negligent for mistakes in diagnosis and treatment, a point covered in a separate instruction. "The repetition was no more than was required for a clear presentation of the issues." *Eickelberg,* 276 N.W.2d at 447. In any event, merely repeating a rule of law is generally not held to be error. *See Livingstone v. Dole,* 184 Iowa 1340, 1347, 167 N.W. 639, 642 (1918).

Read as a whole, the instructions accurately stated the law, did not unduly emphasize any issues, and neither confused nor misled the jury.

---

2. We assume, without deciding, that error has     been preserved on this argument.

We hold that, under the circumstances of this case, the district court did not err in refusing to instruct on abandonment. In addition, the district court did not err in instructing the jury that they could not find the defendants negligent if, in the exercise of their best judgment, they employed one of two or more recognized methods in treating the decedent.

DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.