**Frances HUTCHINSON, Individually and as Administrator of the Estate of Billy Paul Hutchinson, Deceased; and Lena Hutchinson, As Mother and Next Friend of Melissa Perry, A Minor, Appellees,**

v.

**BROADLAWNS MEDICAL CENTER, Stephen Harrison, and Abdul Chughtai, Appellants.**

No. 88-1541.

Supreme Court of Iowa.

July 18, 1990.

David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellants Broadlawns Medical Center and Stephen Harrison.

Robert C. Rouwenhorst of Davis, Grace, Horvath, Gonnerman & Rouwenhorst, P.C., Des Moines, for appellant Abdul Chughtai.

W. Don Brittin, Jr., and Hayward L. Draper of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellees.

Considered by LARSON, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LARSON, Justice.

Billy Paul Hutchinson died as the result of severe staph infection allegedly caused by the negligence of the defendants. A verdict for $250,000 was returned for the plaintiff estate, but a companion claim by the decedent's granddaughter for loss of consortium was dismissed by the court.

Both sides appealed. We affirm on both appeals.

On January 20, 1985, Hutchinson was hospitalized at Broadlawns Medical Center following a heart attack. During his hospitalization, an intravenous catheter or IV needle was left in his arm for approximately six days. When the IV was removed, the needle site showed signs of an infection which was thought to be localized. The infection was first treated with a topical ointment, then with an oral antibiotic. The infection, however, continued to spread. There was expert testimony that the spread of the staph infection could have been stopped only by intravenous antibiotics in doses too large to be administered orally.

On January 28, 1985, Hutchinson was transferred from Broadlawns to Mercy Hospital where an angiogram was to be performed. While Hutchinson was at Mercy, it was observed that the IV site appeared to be infected, and Mercy so notified Broadlawns. Heart bypass surgery was performed at Mercy, and it was then observed that the staph infection had surrounded the heart area. This, apparently, is what caused Hutchinson's death.

Hutchinson's widow filed a wrongful death action, as administrator, against Broadlawns Medical Center and Drs. Stephen Harrison and Abdul Chughtai. A second claim for damages was filed on behalf of Melissa Perry, Billy's granddaughter. A verdict was returned for the plaintiff administrator in the first case; the loss-of-consortium claim was dismissed.

On the defendants' appeal, they contend: (1) the district court should have instructed the jury that a physician cannot be held liable for a decision to select one among several recognized methods of treatment; (2) the court should have instructed the jury that a physician's mistake in diagnosis does not, in itself, constitute negligence; and (3) the court erred by instructing the jury on allegedly duplicative specifications of negligence.

In the cross-appeal, the granddaughter contends that the district court erred in dismissing her claim for damages because

(1) Billy Hutchinson was a "parent" for purposes of assessing death damages under Iowa Code section 613.15 (1987), and (2) Melissa was entitled to pursue a claim at common law for her loss of Billy's consortium.

## I. *The Instructions.*

A court must grant requested instructions which state correct rules of law, unless the concept is embodied in other instructions. *Stover v. Lakeland Square Owners Ass'n,* 434 N.W.2d 866, 868 (Iowa 1989). Parties are not, however, entitled to any particular instruction if the issue is adequately covered in other instructions. As long as the issues involved are adequately covered, the court may choose its own language. *Bossuyt v. Osage Farmers Nat'l Bank,* 360 N.W.2d 769, 774 (Iowa 1985); *Knauss v. City of Des Moines,* 357 N.W.2d 573, 577 (Iowa 1984). Instructions must be read as a whole, not segmented and considered individually. *Sanders v. Ghrist,* 421 N.W.2d 520, 522 (Iowa 1988); *Moser v. Stallings,* 387 N.W.2d 599, 605 (Iowa 1986).

In *Stover,* we provided the following guidelines on drafting jury instructions:

1. Instructions should not marshal the evidence or give undue prominence to any particular aspect of a case;

2. Courts, when instructing the jury, should not attempt to warn against every mistake or misapprehension a jury may make;

3. Jurors must be left to their intelligent apprehension and application of the rules put forth in the instructions.

*Stover,* 434 N.W.2d at 868.

■ A. The defendants first contend that the jury should have been instructed that, if alternative methods of treatment are recognized by the medical profession, a doctor cannot be found negligent simply by choosing the wrong alternative. In *Estate of Smith v. Lerner,* 387 N.W.2d 576 (Iowa 1986), we noted that

the plaintiff introduced evidence that application of electrical shocks by the health center staff would not have bene-

fited the decedent, and that this administration interrupted CPR, damaged the heart, and paralyzed breathing. On the other hand, the defendants' experts testified that it was appropriate to apply electrical shocks, that those shocks could not damage a heart or paralyzing breathing, and that the staff properly administered CPR.

*Id.* at 580. In that case, we approved an instruction that,

[if there are] two or more recognized alternative courses of action which have been recognized by the medical profession or hospitals as proper methods of treatment, and the defendants in the exercise of their best judgment elected one of these proper alternatives[, the jury should find for the defendants].

*Id.* at 581.

In the present case, the issue was not what alternative means of treatment might be appropriate for a given diagnosis. If that were the case, the defendants' requested instruction might be appropriate. The issue in this case was whether the infection had progressed to such a point while Hutchinson was in the care of Broadlawns Hospital that it was no longer localized.

In *Lerner,* we quoted from a California case which stated that the alternative-treatment principle

embodies the notion that differing doctors may disagree in good faith upon what would encompass the proper treatment or diagnosis of a medical problem in *a given situation.* Medicine is not a field of absolutes. There is not ordinarily only one correct route to be followed at any given time.

*Id.* at 581 (quoting *Barton v. Owen,* 71 Cal.App.3d 484, 501–02, 139 Cal.Rptr. 494, 504 (1977)) (emphasis added). In the present case, it was not "a given situation" with which the doctors were confronted. Here, the critical issue was the diagnosis: was it a localized or generalized infection. If it was the latter, the experts agreed that intravenous treatment would be the only successful approach. The jury apparently concluded it was not localized. Under

these circumstances, it was not error to refuse the alternative-treatment instruction, because under the evidence there was no alternative to intravenous injections if the infection was generalized.

■ B. The defendants also complain that the trial court erred in refusing to instruct that failure to diagnose a condition properly is not sufficient, alone, to establish negligence. They requested an instruction that

a doctor cannot be found negligent merely because he/she makes a mistake in the diagnosis and treatment of a patient. Any error in diagnosis and treatment, if you find any, does not in and of itself constitute negligence. For a doctor to be found negligent, it must be shown by a preponderance of the evidence that the doctor, in making his/her diagnosis and treatment, failed to follow the customary practice and procedure of doctors under similar circumstances. This is the standard by which the doctor is to be judged.

The requested instruction, in substance, advised the jury that a doctor cannot be found liable merely because of a mistake in diagnosis and treatment and that liability on the basis of such a mistake may be found only if the doctor has failed to follow the established standards of care under similar circumstances.

We agree with the plaintiffs that these matters were adequately covered in the court's instructions when they are considered as a whole. In Instructions 20 and 21 the jury was advised that the defendants could be found liable only if the plaintiff proved they were negligent. Instructions 16 and 17 informed the jury that, if the defendants had failed to "use the degree of skill, care, and learning ordinarily possessed and exercised" by other doctors and hospitals, they would be guilty of negligence. Instruction 15 stated that the mere fact that an incident occurred and a lawsuit was filed did not establish that the defendants were negligent. Instruction 19 advised the jury that the result of the treatment administered to the decedent was not evidence of negligence but was a

circumstance to be considered in assessing the charges of negligence.

Under the court's instructions, the plaintiffs could succeed only if they proved a failure to meet a standard of care in the profession, and proper diagnosis is only a part of that care. The defendants were free to argue, and apparently did, that a misdiagnosis alone did not necessarily constitute a breach of those standards.

■ C. The defendants also object to the court's alleged duplication of the specifications of negligence. The jury was instructed that, in order to prove their case against Broadlawns and the doctors, the plaintiffs must prove negligence in one or both of the following ways: (a) in failing to change the IV catheter every forty-eight to seventy-two hours, and (b) in failing to properly treat the IV site. The defendants contend that these specifications overlap each other and unduly emphasize this basis of liability. We do not agree. Negligence and treatment of the IV *site* which, of course, remained after the IV needle was withdrawn, is not the same as negligence in leaving the needle in place for an excessive time.

## II. *The Granddaughter's Claims.*

■ The decedent's granddaughter, Melissa Perry, filed her own claims based on two theories: as an element of death damages under Iowa Code section 613.15; and as an independent claim at common law for loss of consortium.

A. Iowa Code section 613.15 (1987) provides:

In any action for damages because of the wrongful or negligent injury or death of a woman, there shall be no disabilities or restrictions, and recovery may be had on account thereof in the same manner as in cases of damage because of the wrongful or negligent injury or death of a man. In addition she, or her administrator for her estate, may recover for physician's services, nursing and hospital expense, and *in the case of both women and men, such person, or the appropriate administrator, may recover the val-*

*ue of services and support as spouse or parent, or both,* as the case may be....

The pivotal question in applying section 613.15 is whether Hutchinson had provided services and support as a "parent." He was not a biological "parent"; and while he had a biological link as grandfather, grandparents are not mentioned in section 613.15. In view of the restrictive scope of section 613.15, the defendants argue, allowing a recovery for a grandchild would amount to judicial legislation.

Melissa argues, in effect, that services as a parent under this section mean parental-type services, such as those furnished by the grandfather here. She argues that Billy was, for all practical purposes, a parent because he furnished the care, support, and discipline normally provided by parents. The plaintiff, however, faces case authority which reveals a narrow application of section 613.15. For example, in *Miller v. Wellman Dynamics Corp.,* 419 N.W.2d 380, 383 (Iowa 1988), we held that the lost services of a child are not covered by section 613.15, because a child is not expressly mentioned.

Melissa points out, however, that this case presents a unique aspect not involved in our prior cases: Billy had been appointed as "custodian" for Melissa following a CINA adjudication under Iowa Code chapter 232. Iowa Code section 232.2(11) provides this with respect to such custodians:

*"Custodian"* means a stepparent or a relative within the fourth degree of consanguinity to a child who has assumed responsibility for that child, a person who has accepted a release of custody pursuant to division IV, or a person appointed by a court or juvenile court having jurisdiction over a child. The rights and duties of a custodian with respect to a child are as follows:

*a.* To maintain or transfer to another the physical possession of that child.

*b.* To protect, train, and discipline that child.

*c.* To provide food, clothing, housing, and medical care for that child.

*d.* To consent to emergency medical care, including surgery.

*e.* To sign a release of medical information to a health professional.

All rights and duties of a custodian shall be subject to any residual rights and duties remaining in a parent or guardian.

While it is true that Billy Hutchinson was required as custodian to furnish parental-type services and support on behalf of Melissa, this does not make him a "parent" for purposes of section 613.15. If it did, any person appointed as custodian would qualify as a "parent" for purposes of this section, thereby expanding it beyond its clearly expressed parameters. Despite the fact Billy had provided parental-type services, he was not a parent. We agree with the district court that dismissal of the section–613.15 claim was appropriate.

■ B. Melissa's alternative argument is that, if we do not recognize a claim by her under section 613.15, we should recognize a common-law loss-of-consortium claim on her behalf. We have previously recognized loss-of-consortium actions only by spouses, parents, and children. *See Laws v. Griep,* 332 N.W.2d 339 (Iowa 1983); *Weitl v. Moes,* 311 N.W.2d 259 (1981). Grandchildren have not been included, but Melissa asks that we consider Billy Hutchinson to be a "parent" for loss-of-consortium purposes for the same reasons that she urged in her claim for damages under section 613.15.

*Laws* addressed an analogous issue, whether a claim for loss of consortium would be recognized in the case of "unmarried, cohabiting men and women who live together in a 'stable and significant relationship.'" 332 N.W.2d at 340. We declined to recognize such a claim, pointing out that the public policy of this state favoring the *de jure* family as the basic unit of social order would be subverted if persons could gain marital legal rights without accepting the legal responsibilities of marriage. We also pointed out that the majority of other courts addressing this question had refused to recognize loss-of-consortium claims. *Laws,* 332 N.W.2d at 341.

Melissa attempts to distinguish *Laws* on the basis that there is no public policy which would be offended if we recognized a loss-of-consortium claim by a grandchild when the relationship was as substantial and stable as this one. For the same reasons as discussed in the preceding division, however, we believe that Billy Hutchinson cannot be considered to be a "parent." To do so would launch this court on a course which conceivably would allow recovery for damages to any person providing actual support to the claimant, including stepparents and others standing *in loco parentis.* This would be contrary to our public policy which encourages formalization of such informal relationships. In the case of children, this would of course require adoption.

We agree with the district court that neither the loss-of-consortium claim nor the claim under section 613.15 should be recognized. Accordingly, we affirm on both the appeal and cross-appeal.

AFFIRMED ON BOTH APPEALS.