# IN THE COURT OF APPEALS OF IOWA

No. 16-0710
Filed June 7, 2017

NICOLE BROOKS, and BRENDAN BROOKS, ADDISON BROOKS, and
AIDEN BROOKS, by their mother and next friend, NICOLE BROOKS,
    Plaintiffs-Appellants,

vs.

STATE OF IOWA,
    Defendant-Appellee.
_____

    Appeal from the Iowa District Court for Bremer County, Christopher C.

Foy, Judge.

    Nicole Brooks appeals the denial of her motion for a new trial.

**AFFIRMED.**

    Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines and Beau

D. Buchholz of Engelbrecht and Buchholz, P.L.L.C., Waverly, for appellants.

    Thomas J. Miller, Attorney General, and Joanne Moeller, Assistant

Attorney General, for appellee.

    Heard by Vogel, P.J. and Doyle and McDonald, JJ.

**VOGEL, Presiding Judge.**

After suffering a heart attack and being treated by the University of Iowa Hospitals and Clinics (UIHC), Brooks[1] sued the State of Iowa[2] for negligence. Although a jury found the State negligent, it awarded no damages. Brooks appeals two of the district court's rulings at trial and the district court's denial of her motion for a new trial. Specifically, she claims: (1) the district court erred in failing to admit a letter written by UIHC's Chief Quality Officer; (2) the district court erred in giving a jury instruction regarding alternate methods of treatment; (3) juror misconduct occurred; and (4) the verdict was legally inconsistent.

### I.     Background Facts and Proceedings

Around 9:30 a.m. on May 2, 2012, Nicole Brooks began experiencing chest pain. She called her husband, who is a family physician, and he advised her to sit down, drink water, and relax. After a few minutes passed, Brooks was still experiencing pain; she texted her husband, who immediately scheduled her for an evaluation at a clinic in Waverly. At the clinic, Brooks was examined by Dr. Lee Fagre, and an electrocardiogram (EKG) was performed around 11:30 a.m. The doctor believed the EKG indicated Brooks was in the process of experiencing a heart attack. Dr. Fagre then sent Brooks, by ambulance, to the local hospital, the Waverly Health Center.

After arriving at Waverly Health Center around noon, another EKG was performed, which also indicated an ongoing heart attack, and Brooks was sent to Covenant Hospital in Waterloo to see a cardiologist—Dr. Ahsan Maqsood.

---

[1] Brooks sued on behalf of herself and her children.
[2] UIHC is an entity of the State.

Brooks arrived at Covenant Hospital at approximately 12:58 p.m. Dr. Maqsood performed an angiogram, which revealed that two of Brooks's arteries that supply blood to the heart were mostly blocked. During the procedure, Brooks went into ventricular fibrillation arrest—an irregular heart rhythm—which required Dr. Maqsood to shock the heart back into normal rhythm and insert an intra-aortic balloon pump to support the heart. Dr. Maqsood recommended Brooks be transferred to UIHC for coronary bypass grafting surgery (CABG).

At approximately 3:27 p.m., Brooks arrived at UIHC and was seen by Dr. Elaine Demetroulis, an interventional cardiologist. After Brooks arrived, UIHC cardiology personnel performed another EKG, an echocardiogram, vascular mapping, and an ultrasound of Brooks's carotid artery. Dr. Demetroulis, along with a team of other doctors, reviewed the results of these procedures. Dr. Demetroulis testified that they were still not positive what was causing Brooks's heart issues, so they decided to perform another angiogram. Dr. Demetroulis testified that she concluded the additional angiogram was necessary to determine the best course of treatment for Brooks. When asked about the time delay caused by the additional diagnostic procedures, Dr. Demetroulis said:

> Once you get past three hours, the importance of time becomes less. And certainly after six hours it's even less than that. Now, it doesn't mean that it's unimportant. But, again, that balanced with the complexity of what we were seeing on the angiogram and all the other studies, um, and knowing that we potentially had to go to surgery, all of those studies were absolutely necessary to her care.

After reviewing the results of the final diagnostic procedures around 6:00 p.m., Dr. Demetroulis and several other physicians discussed the merits and risks of performing either a percutaneous coronary intervention (PCI) or CABG.

Ultimately, the doctors decided a PCI was the best course of treatment at that time, as the risk of death during the procedure was lower with a PCI than with a CABG. Because of the nature of the injury to Brooks's heart, there was a risk the PCI would not be successful and surgery would still be necessary, so an operating room was prepared prior to Dr. Demetroulis performing the PCI. While attempting to perform the PCI, complications arose, and Dr. Demetroulis concluded that it was less risky to stop and go to surgery, rather than to continue the PCI.

Brooks arrived in the operating room for CABG at approximately 7:46 p.m. Dr. Robert Farivar performed three grafts on Brooks's heart, but none were successful in restoring blood flow to her heart. Following the unsuccessful surgery, UIHC's cardiac myopathy, or heart failure, team took over Brooks's care to determine whether her heart would regain any functioning. After several days with little improvement, the heart-failure team determined that an Impella device should be implanted to temporarily support Brooks's heart in pumping.

On May 8, surgery was performed by Dr. Michael Bates and Dr. Phillip Horwitz, and an Impella device was successfully implanted. Brooks was taken from the operating room to the surgical intensive care unit following surgery at around 5:43 p.m. Around 7:30 p.m., four nurses performed a "logroll" maneuver to turn Brooks and change her bedsheets. After turning Brooks over, the nurses noticed she began bleeding from the area where the Impella device had been implanted. Brooks was taken back to the operating room, and the doctors determined that the Impella device had become dislodged. The team then decided to implant a different device to support Brooks's heart. On May 25, a

permanent pumping device was placed in Brooks's heart to support it until she could receive a heart transplant. On June 6, 2013, Brooks received a heart transplant at the Mayo Clinic in Rochester, Minnesota.

On December 9, 2013, Brooks filed a claim with the State Appeal Board, a precursor to a tort suit against the State, alleging negligence against UIHC. Following the required six-month waiting period, Brooks filed her claim in district court. Brooks generally claimed UIHC should have immediately attempted CABG and the delay in doing so caused additional damage to her heart, ultimately resulting in the need for a heart transplant. Brooks also asserted UIHC was negligent in several of its procedures, including the "logroll" maneuver that caused her Impella device to become dislodged.

At trial, Brooks attempted to admit a letter Dr. Richard LeBlond, Chief Quality Officer at UIHC, sent to Brooks's husband in response to complaints regarding Brooks's care. The letter outlined the conclusions of a "formal review" UIHC performed regarding its procedures involving the use of the Impella device. In part, the letter concluded:

> Patients should not be repositioned within the first several hours after implantation. This means that patients will leave the procedure suite in the SICU bed with all personal care issues attended to by the team before leaving the procedure suite obviating the need to reposition the patient in the first few hours.

Following UIHC's objection to admission of the letter, the district court excluded it.

In sorting out which instructions would be given to the jury, the State requested an alternate-methods-of-treatment instruction, which read:

Physicians may disagree in good faith upon what would be the proper treatment or diagnosis of a medical condition in a given situation. If you find that there were two or more alternative courses of action which the medical profession then recognized as proper methods of treatment and the physicians who cared for Nicole Brooks at the UIHC, in the exercise of their best judgment, elected one of these proper alternatives, then the physicians were not negligent.

The district court gave this instruction over Brooks's objection.

On November 2, 2015, the jury found UIHC had been negligent in its care of Brooks but concluded UIHC's negligence was not a cause of damage to Brooks and did not award her any damages. Brooks filed a motion for new trial, alleging multiple errors by the district court. On March 28, 2016, the court rejected all of Brooks's claims of error and denied her motion for a new trial. Brooks appeals.

## II. Scope of Review

Generally, we review evidentiary rulings for abuse of discretion. *Hall v. Jennie Edmundson Mem'l Hosp.*, 812 N.W.2d 681, 685 (Iowa 2012). However, "[t]o the extent a challenge to a trial court ruling on the admissibility of evidence implicates the interpretation of a statute, our review is for errors at law." *Keefe v. Bernard*, 774 N.W.2d 663, 668 (Iowa 2009).

We review claims regarding jury instructions for correction of errors at law. *Alcala v. Marriot Int'l, Inc.*, 880 N.W.2d 699, 707–08 (Iowa 2016).

Our scope of review in appeals from a motion for a new trial depends on the underlying ground for the motion. *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006). "Denial of a motion for new trial 'based on a discretionary ground such as misconduct' is

reviewed for an abuse of discretion." *Giza v. BNSF Ry. Co.*, 843 N.W.2d 713, 718 (Iowa 2014). "However, the question whether a verdict is inconsistent . . . is a question of law." *Clinton Physical Therapy Servs.*, 714 N.W.2d at 609. Thus, we review denial of a motion on that ground for errors at law. *Id.*

### III.    Exclusion of the LeBlond Letter

Brooks claims the district court erred in excluding the letter from Dr. LeBlond regarding the formal review of procedures following the implantation of an Impella device. Specifically, Brooks claims the letter was not covered by the statutes it was excluded under.

At trial, the district court excluded the letter under Iowa Code section 135.42 (2015), which relates to the privileged nature of morbidity and mortality studies. Section 135.40 allows hospitals to:

> provide information, interviews, reports, statements, memoranda, or other data relating to the condition and treatment of any person to . . . any in-hospital staff committee . . . to be used in the course of any study for the purpose of reducing morbidity or mortality, and no liability of any kind or character for damages or other relief shall arise or be enforced against any person or organization that has acted reasonably and in good faith, by reason of having provided such information or material, or by reason of having released or published the findings and conclusions of such groups to advance medical research and medical education, or by reason of having released or published generally a summary of such studies.

Section 135.42 adds:

> All information, interviews, reports, statements, memoranda, or other data furnished in accordance with this division and any findings or conclusions resulting from such studies shall not be used or offered or received in evidence in any legal proceedings of any kind or character, but nothing contained herein shall be construed as affecting the admissibility as evidence of the primary medical or hospital records pertaining to the patient or of any other writing, record or reproduction thereof not contemplated by this division.

The letter Brooks sought to admit relayed the findings of a formal review conducted by a committee of doctors and nurses regarding care protocols surrounding the use of Impella devices. The committee was formed in response to the incident when Brooks was moved after having an Impella device implanted and aimed at reviewing and improving the protocols for care in such situations. We determine the committee qualifies as an "in-hospital staff committee" charged with conducting a "study for the purpose of reducing morbidity or mortality" under section 135.40. As such, the plain language of section 135.42 prohibits any findings or conclusions from its studies from "be[ing] used or offered or received in evidence in any legal proceedings of any kind or character."

The purpose of the privilege for morbidity and mortality studies also supports exclusion of the letter. In *Burton v. University of Iowa Hospitals and Clinics*, our supreme court described the purpose of the privilege:

> [The privilege] allows a physician to consult with peers about his [or her] care and treatment of a particular patient. It also allows critical retrospective analysis of cases to learn better methods of treatment for the future. Similarly, it encourages peers to lodge complaints and initiate disciplinary action against those who are practicing substandard care, without fear of disclosure or retribution.

533 N.W.2d 182, 188 (Iowa 1997) (alterations in original) (quoting *Carolan v. Hill*, 553 N.W.2d 882, 886 (Iowa 1996)). The formal review of the events surrounding the implantation of the Impella device engaged in exactly the type of "critical retrospective analysis" contemplated by the privilege with the goal of "learn[ing] better methods of treatment for the future." *See id.* Accordingly, the purpose of the privilege is served by excluding the findings and conclusions of the review, which were expressed in the letter, from being used in this case.

Based on the plain language and purpose of sections 135.40 and 135.42, we conclude the district court correctly excluded the letter.

## IV. Jury Instruction

Brooks also claims the district court erred in giving instruction number 18, a so-called alternate-methods-of-treatment instruction. The State claims the instruction was a correct statement of the law and was appropriate.

Under Iowa law, courts are required to give a requested jury instruction "if it correctly states the applicable law and is not embodied in other instructions." *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994). An instruction must also be supported by the evidence to warrant submission. *Peters v. Vander Kooi*, 494 N.W.2d 708, 713 (Iowa 1993). Our supreme court has stated:

> In order for an instruction on alternative methods of treatment to have an adequate factual basis in the record, two elements must be shown by substantial evidence. These are: (1) that, with respect to a particular act or omission upon which the claim of negligence is predicated, there was more than one method of treatment acceptable to a physician exercising the degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances; and (2) that the physician considered these alternatives and exercised his or her best professional judgment in choosing the method of treatment that was utilized.

*Id.* Evidence is considered substantial when "a reasonable mind would accept it as adequate to reach a conclusion." *Bride v. Heckart*, 556 N.W.2d 449, 452 (Iowa 1996). "In considering whether the instruction is supported by substantial evidence, we give the evidence the most favorable construction it will bear in favor of supporting the instruction." *Asher v. Ob-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496–97 (Iowa 2014), *overruled on other grounds by Alcala*, 880 N.W.2d at 707–08.

Based on our review of the record, we conclude it was appropriate for the district court to give the alternate-methods-of-treatment instruction. The instruction correctly states the law. *See Estate of Smith v. Lerner*, 387 N.W.2d 576, 581 (Iowa 1986) (noting "[s]everal jurisdictions have concluded a physician is not negligent in selecting among two or more recognized methods in treating a patient"). Additionally, there was substantial testimony in the record from expert witnesses that "there was more than one method of treatment acceptable to a physician exercising the degree of skill, care, and learning ordinarily possessed and exercised by other physicians" for treating Brooks and substantial testimony from the treating physicians that the alternatives were discussed, the benefits and drawbacks weighed, and choices made based on their best professional judgment. *See Peters*, 494 N.W.2d at 713. Accordingly, we discern no error in the district court's decision to give the alternate-methods-of-treatment instruction.

## V. Juror Misconduct

Brooks next argues juror misconduct occurred. She claims the misconduct resulted from the district court's application of Iowa Code section 147.136, which outlines the subrogation rights of Brooks's health insurance company. Brooks does not disagree that section 147.136 applied to her; rather, she claims the evidence she presented regarding the subrogation rights of her insurer caused juror misconduct. The State argues Brooks failed to preserve error on this issue and if she did, there was no juror misconduct.

## A.     Error Preservation

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).  The issue of juror misconduct was raised by Brooks in her motion for a new trial and ruled on by the district court in its denial of Brooks's motion for a new trial.  The State claims this is insufficient to preserve error because Brooks did not object to the admission of the evidence under section 147.136 that she claims caused the misconduct.  In determining whether error has been preserved, we look to the substance of the claim.  *See State v. Webster*, 865 N.W.2d 223, 232–34 (Iowa 2015) (holding error may be preserved based on the substance of a claim, rather than the label).  Here, Brooks is not challenging the admission of the evidence under section 147.136, she is raising a claim of juror misconduct.  Because she supports her claim with an affidavit of a juror given post-verdict, we do not see how she could have raised the issue earlier.  The issue was properly raised in her motion for a new trial and was ruled on by the district court.  Thus, we consider it preserved.  *See Meier*, 641 N.W.2d at 537.

## B.     Merits

Brooks claims the jury misapplied the evidence of her medical bills and the subrogation rights of her insurance company and decided not to award her damages.  In support of this claim, she offers an affidavit from one of the jurors.

Iowa Rule of Civil Procedure 5.606(b)(1) provides:

> [A] juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything upon that juror's or another juror's vote; or any juror's mental processes

> concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

The only exception to the ban on juror testimony about deliberation is when: (1) "[e]xtraneous prejudicial information was improperly brought to the jury's attention"; (2) "[a]n outside influence was improperly brought to bear on any juror"; or (3) "[a] mistake was made in entering the verdict on the verdict form." Iowa R. Civ. P. 5.606(b)(2)(a)–(c).

In determining whether something amounts to an outside influence, our supreme court has looked to whether the information was introduced "outside the rigors of the trial process." *Webster*, 865 N.W.2d at 236. In addition, the court has stated extraneous prejudicial information "refers to information that was not part of the record and not presented in court." *Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 653 (Iowa 1995). Here, the evidence Brooks claims prejudiced the jury was introduced by her, presented in court, and was part of the record. It does not fall under any of the exceptions to the ban on juror testimony about deliberations. Brooks's claim is nothing more than an attempt to attack "the components of deliberation including juror arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process occurring in the jury room." *Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). Thus, the affidavit is inadmissible.

Absent the affidavit, there is no evidence of juror misconduct. Accordingly, we affirm the district court's finding that there was no juror misconduct.

## VI.    Inconsistent Verdict

Brooks's final claim is that the jury's verdict was legally inconsistent and should be set aside.  The State responds the verdict is not inconsistent.[3]

In order to support an entry of judgment, a verdict must be internally consistent.  *Clinton Physical Therapy Servs.*, 714 N.W.2d at 612–13.  If the verdict is not internally consistent, "then the court must either resume deliberations or grant a new trial."  *Id.*  However, "a verdict is not inconsistent if it can be harmonized in a reasonable manner consistent with the jury instructions and the evidence in the case, including fair inferences drawn from the evidence." *Id.*

Brooks contends it is legally inconsistent for the jury to respond in the affirmative to the question: "Were the physicians and nurses at the University of Iowa Hospitals and Clinics negligent in their care of Nicole Brooks?" and then not award damages.  However, Brooks overlooks the jury's response to the question that encapsulated the causation element of a negligence action.  The jury responded in the negative to the question: "Was the negligence of the physicians and nurses at the University of Iowa Hospitals and Clinics a cause of any item of damage to Plaintiffs'?"  In attempting to harmonize these answers, the district court stated:

---

[3] The State also asserts that error was not preserved on this issue because Brooks did not challenge the consistency of the verdict before the jury was dismissed.  However, because the parties agreed to a sealed verdict, we conclude the issue could be raised in a motion for a new trial.  *See Clinton Physical Therapy Servs.*, 714 N.W.2d at 610 ("When parties agree to a sealed verdict, they lose their right to have a verdict returned in open court where inquiry can be made into its findings.  *See* Iowa R. Civ. P. 1.931.  Consequently, it is not possible to use additional deliberations as a remedy for an inconsistency in a verdict when a sealed verdict is used in a case.").

> Given the variation in the strength of the causation evidence presented by Plaintiffs with respect to the different grounds of negligence they alleged and according proper deference to the fact-finding function of the jury, the [c]ourt concludes that the decision of the jury to award no damages can be harmonized with its finding that Defendant was negligent in some aspect of the care of Ms. Brooks.

We agree. The jury's verdict can be harmonized on the basis that it could have concluded that UIHC was negligent in some aspect of its care of Brooks and also concluded that such negligence was not the cause of any damage to Brooks. *See Crow v. Simpson*, 871 N.W.2d 98, 107 (Iowa 2015) (finding a verdict was not inconsistent where the jury found fault but not causation).

## VII. Conclusion

Because we find the district court properly excluded the letter, the district court properly gave the challenged instruction, there was no juror misconduct, and the verdict was not inconsistent, we affirm.

**AFFIRMED.**