# IN THE COURT OF APPEALS OF IOWA

No. 23-1707
Filed August 6, 2025

ANTHONY LEO,
      Plaintiff-Appellant,

vs.

LYNN NELSON, M.D. and DES MOINES ORTHOPAEDIC SURGEONS, P.C.
d/b/a DMOS,
      Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

A plaintiff appeals an adverse jury verdict on his medical-malpractice claim.
**AFFIRMED**.

James H. Cook of Daniels, Hines, Kalkhoff, Cook & Swanson, P.L.C., Cedar Falls, for appellant.

Connie L. Diekema and Aaron J. Redinbaugh of Finley Law Firm, P.C., Des Moines, for appellees.

Considered without oral argument by Schumacher, P.J., and Buller and Langholz, JJ.

**LANGHOLZ, Judge.**

Anthony Leo sued his doctor, Lynn Nelson, for medical malpractice over the post-operative care he received following spinal surgery.[1] He alleged that Nelson was negligent by failing to order a post-operative magnetic resonance imaging ("MRI"). At trial, the court gave the jury an alternative-methods-of-treatment instruction, over Leo's objection. And the jury returned a general verdict that Nelson was not negligent.

Leo appeals, arguing that the court erred in giving the alternative-methods-of-treatment instruction because there was no dispute at trial about whether Nelson made a choice between alternative methods of treatment. According to Leo, the standard of care for ordering a post-operative MRI was undisputed—the only fight was whether Leo exhibited symptoms sufficient to warrant post-operative imaging under that proper treatment. We disagree. The testimony of the parties' dueling expert witnesses provides substantial evidence that there were two methods of treatment for post-operative imaging. And so, the district court did not err in giving the jury the challenged alternative-methods-of-treatment instruction.

I.

In late January 2018, Nelson performed surgery on Leo's spine. Leo spent two nights in the hospital and then was discharged. But a day later, Leo called Nelson to tell him that he was having some pain in his right arm and wanted to know if this was normal. Nelson reassured him that this was normal, but he should continue to monitor his symptoms.

---

[1] Leo also sued Nelson's employer, Des Moines Orthopaedic Surgeons, P.C. As the defendants' positions are identical, we refer to only Nelson for readability.

About a week later—eleven days after the surgery—Leo returned for his post-operative evaluation with Nelson. Leo again complained of upper arm pain and weakness and pain over one of the incisions. He also voiced concerns about returning to his job as a general surgeon. In his physical exam of Leo, Nelson noted that Leo appeared "comfortable and moves well about the room," and he conducted strength tests for his arms and wrists. Nelson reassured Leo about his symptoms and recommended that he start occupational therapy for his hand.

Leo called Nelson eleven days later reporting that he had started hand therapy sessions but that he still had weakness in his hand. Nelson told him to allow his symptoms more time to improve "as he is only 3 weeks postop and [has] only had one [h]and therapy session thus far." At his scheduled follow-up appointment a month later—about two months after the surgery—Leo again reported right-hand dysfunction and arm pain but said his pain had improved some. Nelson offered to perform a new MRI, but after discussing it, he and Leo decided to wait and see if more time helped with the pain.

In April, Leo had a planned surgery on his right shoulder for a rotator-cuff repair that was performed by a different doctor. About a month after that surgery— roughly fourteen weeks after the spinal surgery—Leo called Nelson again. Leo reported that his "right hand does not function still" and asked to get an MRI. Nelson agreed to order the MRI, which was performed a week later. And a few days later at the end of May, Nelson discussed the MRI results with Leo at a follow-up appointment. Nelson explained that the scans showed that one of the grafts he performed at one of the spinal segments had collapsed and that further surgery might be needed.

Leo soon switched to a new doctor, who performed another spinal surgery to address the collapsed graft and to decompress the spine in June 2018. Following this surgery, Leo again complained about pain and the functionality of his hand. The new doctor also did not order a post-operative MRI. But three months later, an electromyogram ("EMG") showed "slight improvement" to the compression of the spinal segment. And the doctor said the only thing left to do for the pain was to "give [it] more time." Unfortunately, after further consultations with specialists and still not regaining the motor skills in his right hand required for his job, Leo was told that "there does not seem to be any further surgical intervention which could improve" his symptoms.

Leo eventually sued Nelson for medical malpractice. During the six-day jury trial, both parties called expert witnesses who testified about the standard of care for using post-operative MRIs. Leo's expert witness testified that "[w]hen someone who has spine surgery who wakes up worse" or "over the days, if someone is worse off, it is a very easy thing to do, is to get an MRI to check to make sure that the goals of your surgery were accomplished, and there is nothing that's correctable" so that "it could be corrected at that time." And he testified that there is "no downside to getting" an MRI "because I could use that information to make a good decision about what to do next, and without that test, I can't make that determination." Leo's expert thus concluded that because Leo woke up with worse symptoms after the surgery, Nelson should have ordered an MRI.

Nelson's two experts shared a different opinion. One testified that whether to order an MRI is a "judgment call." He agreed that the records did not show that Leo's "pain was out of proportion"—but rather that his pain was "very typical" and

the things Leo was complaining about post-surgery were all "normal things" for someone who underwent this type of procedure. He also explained that while Leo had pain, "if you look at his strength over time, he was improving" which cuts against "getting an MRI." And he "totally disagree[d]" with Leo's expert's opinion that there were no downsides to obtaining an MRI—explaining that there must be a justification for getting an MRI, and when someone is improving despite having the typical pain with surgery, like Leo, an MRI would not be approved.

Nelson's second expert also rejected the opinion "that anytime a patient raises a subjective complaint of increased pain, an MRI should be obtained because there is no downside." He explained that "the imaging study's primary role is to support or refute what the clinician is seeing from the patient, both from subjective complaints which are important, but almost more importantly, objectively what is occurring, the reason is because imaging studies are fraught with abnormal findings" and "you don't operate on imaging. You're operating on patients." According to this expert, a doctor should order a post-operative MRI "[i]f there is a significant clinical change, either pre-operatively or post-operative, or if the patient has severe intractable pain, pain out of proportion of what might be expected." And based on his review of Leo's records, he concluded that Nelson properly investigated Leo's post-operative complaints with a clinical examination and reasonably exercised "his clinical judgment in not ordering an earlier MRI."

At the close of the case, the district court gave the jury an alternative-method-of-treatment instruction as proposed by Nelson:

> Physicians may disagree in good faith upon what would be the proper treatment or diagnosis of a medical condition in a given situation. It is for the physician to use his or her professional

judgment to select which recognized method of treatment to use in a given situation. If you determine that there were two or more recognized alternative courses of action which have been recognized by the medical profession as proper methods of treatment and Dr. Nelson, in the exercise of his best judgment, elected one of these proper alternatives, then Dr. Nelson was not negligent.

In doing so, the court overruled Leo's objection that the instruction was inappropriate because there were not two alternative methods of treatment. The court reasoned that "the evidence suggests that there were two alternative, recognized alternative courses of action" presented by each of the parties' experts.

The jury ultimately returned a verdict finding that Nelson was not negligent in his post-operative treatment of Leo. Leo now appeals.

II.

The district court must "instruct the jury as to the law applicable to all material issues in the case." Iowa R. Civ. P. 1.924. And "[t]he court must grant requested instructions that state correct rules of law unless the concept is embodied in other instructions." *Vachon v. Broadlawns Med. Found.*, 490 N.W.2d 820, 822 (Iowa 1992). But it is error for the court to give "instructions that are not related to the factual issues to be decided by the jury" even if "they may set out a correct statement of the law." *Id.* In other words, the record must contain "substantial evidence" showing "an adequate factual basis" for the instruction. *Peters v. Vander Kooi*, 494 N.W.2d 708, 713 (Iowa 1993). And when an instructional error is prejudicial, the error warrants reversal. *See id.* at 713–14. We review a district court's decision to give a challenged jury instruction for correction of errors at law. *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

Leo challenges the district court's alternative-methods-of-treatment instruction. Such an instruction has a factual basis in the record when substantial evidence shows: (1) "there was more than one method of treatment acceptable to a physician exercising the degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances" for the specific act or omission on which the negligence claim is based, and (2) "the physician considered these alternatives and exercised his or her best professional judgment in choosing the method of treatment that was utilized." *Peters*, 494 N.W.2d at 713. "[T]reatment is a broad term covering all the steps taken to effect a cure of an injury or disease, including examination and diagnosis." *Vachon*, 490 N.W.2d at 823. And the alternative-method-of-treatment instruction reflects "*that differing doctors may disagree in good faith upon what would encompass the proper treatment or diagnosis of a medical problem in a given situation.* Medicine is not a field of absolutes. There is not ordinarily only one correct route to be followed at any given time." *Est. of Smith v. Lerner*, 387 N.W.2d 576, 581 (Iowa 1986) (cleaned up).

Leo argues that the alternative-methods-of-treatment instruction was not supported by substantial evidence because "there was no issue at trial as to whether Dr. Nelson made a choice between alternative methods of treatment."[2] He points out that Nelson's surgical treatment was not criticized and contends that "there was no disagreement as to the need for post-operative imaging if there were new or worsening symptoms." We disagree.

---

[2] We understand Leo to be challenging only the first element needed to give the alternative-methods-of-treatment instruction. So we do not consider the second.

To be sure, Leo is correct that only Nelson's post-operative care was at issue. But such care—including when an MRI should be ordered—falls within the "broad" definition of treatment for which there may be two alternatives. *Vachon*, 490 N.W.2d at 823. And contrary to Leo's assessment of unanimity as to when a post-operative MRI should be ordered, the parties presented competing expert testimony on that issue.

Leo's expert testified that ordering an MRI is the appropriate treatment for a patient "who has spine surgery who wakes up worse" or "over the days, if someone is worse off" because it provides helpful information and there is "no downside." But both of Nelson's experts disagreed. Rather than ordering an MRI whenever pain is worse than before the surgery, they believed a doctor must consider other factors. As one explained, it would be appropriate to order an MRI "[i]f there is a significant clinical change, either pre-operatively or post-operative, or if the patient has severe intractable pain, pain out of proportion of what might be expected." And they both testified that there are downsides to unnecessarily ordering MRIs that are not supported by proper clinical judgment.

This competing expert testimony is substantial evidence showing that "there was more than one method of treatment acceptable to a physician exercising the degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances" for deciding when to order a post-operative MRI. *Peters*, 494 N.W.2d at 713. Because there was an adequate factual basis, the district court did not err in giving the alternative-method-of-treatment instruction to the jury.

**AFFIRMED**.