**SURGICAL CONSULTANTS, P.C., Appellee,**

v.

**Maxine M. BALL, Appellant.**

No. 88–538.

Court of Appeals of Iowa.

Aug. 23, 1989.

J. Allen Orr, Sioux City, for appellant.

Michael W. Ellwanger of Kindig, Beebe, Rawlings, Nieland, Probasco & Killinger, and Marvin F. Heidman of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for appellee.

Heard by DONIELSON, P.J., and HAYDEN and HABHAB, JJ.

DONIELSON, Judge.

On February 23, 1983, Dr. Larry Foster (Surgical Consultants, P.C.) performed a gastric bypass operation on Maxine Ball. On December 26, 1984, Dr. Foster filed a small claims action against Ball for the unpaid balance of $1,299 due for that operation. Ball counterclaimed against Dr. Foster, alleging negligence and breach of contract. At trial Ball's case was premised on claims of negligence and abandonment. She asserted that because she had not fully paid her bill Dr. Foster refused to provide her with necessary follow-up care, and that as a result she suffered physical, emotional, and economic damages. At the conclusion of Ball's evidence, Dr. Foster moved for a directed verdict as to the counterclaim, and the trial court sustained his motion.

On appeal Ball contends that the trial court erred in granting Dr. Foster's motion for a directed verdict when there was sufficient evidence in the record to submit the

issues of negligence and abandonment to the jury. Specifically, Ball contends that the follow-up care provided by Dr. Foster did not meet the standard and approved practice of care required by a physician. Furthermore, she argues that Dr. Foster abandoned his care for her when a member of Dr. Foster's office staff told her that she was no longer Dr. Foster's patient because she had not paid her bill.

Ball suffered from morbid obesity. Her excessive weight caused her a number of health problems and her physician, Dr. Roberts, suggested that she consult Dr. Foster about the possibility of having a gastric bypass. A "gastric bypass" is a procedure in which a portion of the stomach is stapled, leaving a small pouch as the principle receptacle for food and liquid that enters through the esophagus. The portion of the stomach pouch which actually receives the food is only able to handle very small quantities of food. A portion of the small intestine is used to route the food and liquid out of this small pouch and it then joins with the remainder of the intestinal tract. In order to accomplish this surgery, a surgeon makes an incision through the skin line and also through several inches of subcutaneous fat. The surgeon then reaches a membrane of fibrous tissue that surrounds the abdomen and holds the contents thereof. This tissue surrounding the abdomen is called the fascia. The surgeon cuts through the fascia to enter into the belly cavity. After performing the gastric bypass surgery, a surgeon closes up the fascia with sutures.

On January 18, 1983, Ball met with Dr. Foster. He explained the gastric bypass procedure, its potential complications, and the possible side effects of the surgery. Ball decided to have the surgery and it was performed on February 22, 1983. Following her surgery Ball had several follow-up visits with Dr. Foster. Ball contends that she had a "foreign body reaction," which is a reaction to the suture material that remains in the body. She testified that she had numerous abscesses caused by infected sutures and that these abscesses were painful and continually drained a malodorous pus. While Dr. Foster did remove one of the sutures on May 16, 1983, she contends that he was negligent in not removing more of them when these abscesses formed.

Ball claims that she had scheduled an appointment to see Dr. Foster in late August of 1984 with regard to her condition. After waiting for awhile to see the doctor, she asked the receptionist when she would be allowed to see him. She claims that Dr. Foster's bookkeeper told her that she was no longer Dr. Foster's patient because she hadn't paid her bill. Ball contends that Dr. Foster abandoned her care and that she suffered as a result thereof.

Ball claims that she tried to contact Dr. Foster several times after his bookkeeper told her she was no longer a patient. She says that Dr. Foster didn't return her calls and did not contact her ever again. She visited Dr. Posey on October 30, 1984, with regard to drainage from her incision. He obtained cultures of the discharge from her incision and prescribed antibiotics for Ball. Ball saw Dr. Posey again on January 15, 1985. On January 28, 1985, Ball visited Dr. Monson. He hospitalized Ball and removed several of her sutures on January 30, 1985. Due to subsequent abscesses, he also removed sutures from Ball in March 1985, September 1985, June 1986, and April 1987.

Dr. Foster testified that his treatment of Ball during her eleven visits with him following the surgery complied with the standard of care required of doctors who share his specialty of bariatric surgery. He contends that it was appropriate to utilize conservative treatment for Ball's abscesses. He advised her on how to use peroxide to clean and bandage the abscesses, and he contends that on at least three of her visits to his office between March 1983 and August 1984, her incision was completely healed. When subsequent eruptions would occur, he would utilize continued conservative treatment. Dr. Foster felt that due to Ball's great weight loss (she weighed 259 pounds at the time of her surgery and 117 pounds at the time of her last office visit on August 13, 1984), abdominoplasty would be required. This is a surgery that is often needed following a gastric bypass. It re-

moves the excess skin that results from the weight loss. This surgery cannot be performed until a patient has obtained her maximum weight loss and has attained a stable weight. During her April 16, 1984, office visit, Dr. Foster asked Ball to contact her insurance company to get authorization for the abdominoplasty. It is not clear whether Ball did in fact contact the company, but on August 17, 1984, following Ball's office visit with Dr. Foster on August 13th, Dr. Foster wrote Ball's insurer seeking authorization for the surgery.

Recognizing that abdominoplasty would be necessitated in Ball's case, Dr. Foster intended to remove her sutures at the time of that surgery. He advised her to use peroxide to clean her wound and to alleviate the drainage. On one occasion he did remove one suture in his office. On a later date he attempted to remove another but could not do so. Because he felt this conservative approach in the treatment was resulting in healing of the incision, he deferred removal of the remainder of the sutures until the abdominoplasty was to be performed.

I. *Scope of Review.* A question involving the sufficiency of evidence to generate a submissible jury issue in the face of a motion for a directed verdict presents an issue of law. *Wolfe v. Graether*, 389 N.W.2d 643, 651 (Iowa 1986). To grant a directed verdict, a trial court must find that the evidence, when considered in the light most favorable to the opposing party, is insufficient as a matter of law to sustain the allegations brought. *Nash v. Schultz*, 417 N.W.2d 241, 243 (Iowa App.1987). The trial court is vested with considerable discretion in determining whether evidence is sufficient to submit it to the jury. *Oberreuter v. Orion Industries, Inc.*, 398 N.W.2d 206, 209 (Iowa App.1986). Generally questions of negligence and proximate cause are for a jury; it is only in exceptional cases that they may be decided as matters of law. *Barnes v. Bovenmyer*, 255 Iowa 220, 223, 122 N.W.2d 312, 314 (1963).

In considering the propriety of the directed verdict, we will give Ball's evidence the most favorable construction it will reason-

ably bear. Iowa R.App.P. 14(f)(2). For purposes of this appeal, the court accepts Ball's characterization of her physical condition following her surgery and throughout her care under Dr. Foster and later under Dr. Monson. Likewise, this court accepts as true her allegation that one of Dr. Foster's staff told her in August of 1984 that she was no longer his patient because of her unpaid medical bills.

II. *Negligence* Ball contends that Dr. Foster was negligent with regard to the follow-up care he provided for her. She argues that substantial evidence existed to support submission of this issue to the jury. The standard of care owed by a doctor to his patient is well established. Doctors are held to such reasonable care and skill as is exercised by the ordinary physician of good standing under like circumstances. *Clites v. State*, 322 N.W.2d 917, 919 (Iowa App.1982). The negligence of a specialist is based on the failure to apply the degree of skill, care, and learning possessed and experienced by specialists in similar circumstances. *Perkins v. Walker*, 406 N.W.2d 189, 191 (Iowa 1987). Three possible means to establish the negligence of a physician have been recognized.

> One is through expert testimony, the second through evidence showing the physician's lack of care is so obvious as to be within comprehension of a layman, and the third (actually an extension of the second) through evidence that the physician injured a party [sic] of the body not involved in the treatment. The first means is the rule and the others are exceptions to it.

*Perin v. Hayne*, 210 N.W.2d 609, 613 (Iowa 1973). *See also, Forsmark v. State*, 349 N.W.2d 763, 768 (Iowa 1984); *Buckroyd v. Bunten*, 237 N.W.2d 808, 811–12 (Iowa 1976); *McCleary v. Wirtz*, 222 N.W.2d 409, 412 (Iowa 1974); *Sinkey v. Surgical Associates*, 186 N.W.2d 658, 660 (Iowa 1971); *Grosjean v. Spencer*, 258 Iowa 685, 692, 140 N.W.2d 139, 143–44 (1966). Similarly, where common knowledge or everyday experience will not permit a lay jury to form an opinion as to a causal connection between alleged acts of negligence and injury to a party, causal connection is essentially

a matter which must be founded upon expert evidence. *Van Iperen v. Van Bramer*, 392 N.W.2d 480, 484 (Iowa 1986). *See also, McCleary*, 222 N.W.2d at 413.

■ At the outset this court notes that Ball was required to establish the alleged negligence of Dr. Foster by the presentation of expert evidence. The circumstances of this case involve a determination as to the appropriate type of follow-up care that is necessitated after a major surgery. It involves an assessment as to a patient's condition and a judgment as to how best treat that condition. This is not a case in which a physician's lack of care is so obvious as to be within the comprehension of a layman.

A review of the record[1] in this case reveals that Ball failed to present substantial evidence as to whether Dr. Foster's treatment of Ball violated the standard of care practiced by other doctors who are engaged in the specialty of bariatric surgery. Ball called the following witnesses during her trial: her daughters, Gay Orr and Patty Stanton; her mother, Leola James; her sister, Carole Rasmussen; Dr. Foster; Dr. Monson; and herself. Nothing in the testimony of Ball's daughters or mother reveals that they could render an expert opinion as to the standard of care necessitated in a case like this. Ball and her sister are both nurse's aides. Her sister offered her opinion as to the type of sutures used by Dr. Foster and her view as to the necessity of antibiotics and a draining tube in this case. This court dismisses the possibility that the testimony of Ball and her sister, Rasmussen, could constitute expert evidence in a case of this nature. No evidence was presented as to the amount or kind of medical education these

women had, or what experience they may have had in the care of surgical wounds of the type involved in this case. Bariatric surgery is a subspecialty of operative procedures for morbid obesity. At issue is the appropriateness of the follow-up care provided for by Dr. Foster. The testimony of nurse's aides is not sufficient to offer a jury any evidence of what the prevailing standard of care for the surgical profession is and whether Dr. Foster met that standard in his care for Ball.

■ Dr. Foster testified as to his conduct in this matter and he contended that the follow-up care provided for Ball was appropriate in this case. The only other witness called by Ball was Dr. Monson, the doctor who she began seeing in January 1985 and who subsequently removed many of her sutures.

Dr. Monson testified that the nonabsorbable suture material used by Dr. Foster in Ball's surgery was proper and that simply because there is a suture reaction resulting in drainage that does not mean there is negligence on the part of the doctor. He stated that it was a standard and approved practice to eventually remove sutures if a suture reaction lasts long enough. He testified that it was his policy to initially use peroxide to try and stop a draining wound and if that wasn't successful, then within thirty to sixty days he would remove the infected suture. He specifically testified that he didn't want to be an "authority" on the amount of time a doctor should wait before removing a suture:

Q. In your office do you have a policy of getting these sutures out if there is pus and infection in that area? A. After a suitable amount of time. Not every sutures [sic] needs to be removed. A lot

1. In examining the evidence presented at trial, this court had only a partial transcript of the trial court proceedings and the reproduction of testimony contained in the appendix submitted by the parties. The partial transcript contained only the testimony of Pamela Miller, Dr. Foster, and Patty Stanton. The appendix contained excerpts from the testimony and depositions of Pamela Miller, Gay Orr, Leola James, Dr. Foster, Patty Stanton, Dr. Roberts, Dr. Posey, Dr. Monson, Carole Rasmussen, Dr. Porter, Dr. Grossman, and Maxine Ball. Rule 10 of the

Iowa Rules of Appellate Procedure provides that it is an appellant's duty to order a transcript and to include all evidence relevant to a determination of whether sufficient evidence existed to support a trial court's decision. This court assumes that the partial transcript and the excerpted material in the appendix reflect the extent of the evidence appellant introduced at trial with regard to the prevailing medical standards in this field, and Dr. Foster's alleged failure to meet these standards in his care of Ms. Ball.

of wounds become infected, especially in thick, obese abdominal walls where the fat doesn't defend itself well and they are viable or they are susceptible to infection. Some people go as high as 50 percent of the wound are [sic] infected or get infected in obese operations, or in any obese patient who has an operation. And if they don't stop draining after a suitable period of time, *and I don't certainly want to be an authority on that amount of time,* but 30 days or certainly maybe 60 days—I work with the wound and use peroxide, try to debride the wound and try to cure the contamination and the infection, but after a period of time if it doesn't clear up, the wound doesn't heal, then I feel that the foreign body or the suture has to be removed. Q. What is your testimony about the effect on early treatment of these bumps or suture reactions? A. As I testified earlier, when you have a wound contaminated and you have at least concluded that the sutures are the offending organ or offending causative agent, that they needed to be removed. And you procrastinate sometimes, and there is no magic time, 30 days or 60 days. There comes a time when you get tired of the wound being draining and there's a time when the patient becomes tired of the wound draining, and many times it's when you both reach that conclusion, because when they are coming in the office every week and they are draining and you are changing dressings and sooner or later you say, okay, we got to do something.

*And I'm not going to sit here with authority and tell you that there is a certain period of days that you take the sutures out, but certainly there is a point in time when you're not getting any where and that's the time when I thing [sic] they should be removed.*
Q. *And what would that period of time be, Doctor?* A. *Thirty days, forty days.* I've followed infected wounds and infected sutures for six weeks and some of them have cleared up and healed over and some of them haven't. As I say, there is a point in time when [they]

bother you and [the] patient become[s] irritated with it and then you take them out and it clears up. [Emphasis added.]

Dr. Monson testified that there was "no problem" with using the "crochet hook method" used by Dr. Foster to attempt to remove sutures from Ball in May of 1983 and February of 1984. "That's just merely a method of obtaining the suture and getting ahold of it and pulling it where you can cut it and remove it."

Dr. Monson was specifically asked by Ball's attorney whether he had an opinion as to whether or not standard and approved care was used in Dr. Foster's follow-up care of Ball. This question was objected to because: Dr. Monson had not had the opportunity to examine the records of Dr. Foster; he had not had the opportunity to examine any of the outpatient or emergency room records at the hospital where Dr. Foster and his partners saw Ball; he had not had the opportunity to examine the deposition of Dr. Foster concerning the care and treatment he provided for Ball; he had never visited with Dr. Foster about the care and treatment he had provided for Ball; and he did not know what clinical observations Dr. Foster had made of this patient during the eighteen months he had provided care for Ball. The court overruled the objection and Dr. Monson offered the following opinion:

Q. What is your opinion, Doctor? A. My opinion is based on what I saw and when I started taking care of the patient. I realized that this was a problem, that there was a conflict and this was discussed with the patient before we embarked on treatment. And I made this known to her: That whatever dispute she had was not going to be my problem. That I did not want to be a part of a lawsuit. That this was something that was between her and her regular physician. I did want to know about it because I had to take the history and find out what operation had been done and what care had been given up until this time. These were infected sutures, and it was my opinion that they—that she was not going to get better. The infec-

tion was going to continue. She was going to continue having this drainage until those sutures were removed and that nothing was going to change. That was my opinion.

Q. Did she tell you that Dr. Foster wouldn't treat her because the bill wasn't paid? A. That's what she told me.

Q. And is that, in your opinion, a reason not to treat a patient? A. A patient tells you things and I don't necessarily know that all the things that they say are right or wrong. Sometimes they are influenced by emotion factors. Disputes could cause problems. *But this is what she said, that he wanted to do a tummy tuck and remove these sutures at that time, which probably would have been appropriate,* and that she told me that he wouldn't do it unless her bill was paid. That's the history that I was given. [Emphasis added.]

Finally, Dr. Monson testified that even if Dr. Foster had removed additional sutures during the eighteen months that he was following Ball's care, the problem of reoccurring foreign body reaction could very well have existed anyway. Dr. Monson noted that the problem of continued infected sutures had existed throughout his care for Ball.

The expert evidence offered by Dr. Monson does not establish that Dr. Foster's care of Ball deviated from the standard of care required of a physician. Dr. Monson would not say with "authority" that there was a specific time at which infected sutures must be removed. He only testified that it was his policy to remove such sutures within a thirty to sixty day time period. A physician's testimony as to his or her personal practices or policies, or as to how he or she would handle a specific case, does not suffice as evidence of the standard of care required of a physician of good standing in similar circumstances. *Freese v. Lemmon,* 267 N.W.2d 680, 688 (Iowa 1978). Furthermore, Dr. Monson testified that Dr. Foster's plan to defer

removal of the sutures until he performed the abdominoplasty would have been "appropriate." If there are two or more courses of action which have been recognized by the medical profession as proper methods of treatment, and the physician, in the exercise of his or her best judgment elected a proper alternative, then the mere fact that such a course of treatment did not produce the best result is not a breach of the standard of care. *Estate of Smith v. Lerner,* 387 N.W.2d 576, 581–82 (Iowa 1986). A physician is not liable to a patient for an honest error of judgment when the physician exercised the requisite degree of care and skill in arriving at that judgment. *Perkins,* 406 N.W.2d at 191.

At most, Dr. Monson's testimony reveals that while he may have chosen to treat Ball's infected sutures differently than Dr. Foster, the treatment offered by Dr. Foster was a recognized alternative method of care. It was Dr. Monson's personal policy to remove sutures within thirty to sixty days from the time they became infected. He testified, however, that deferral of the removal of sutures until an abdominoplasty was performed was an "appropriate" alternative to a piecemeal removal of the sutures.[2] No evidence was offered which tended to contradict the need for an abdominoplasty in this case. Dr. Monson offered no evidence to suggest that Dr. Foster did not exercise his best judgment in coming to his decision to defer removal of the sutures or that Dr. Foster's follow-up care of Ball did not adhere to the standard of care required of doctors in similar circumstances.

Ball was required to present expert evidence on the issue of Dr. Foster's alleged negligence. In failing to do so, Ball lacked substantial evidence of Dr. Foster's negligence and the issue could not be submitted to a jury. The trial court did not err in directing a verdict on the issue of Dr. Foster's negligence.

III. *Abandonment.* Ball claims that Dr. Foster's bookkeeper told her in August

2. Dr. Porter testified as an expert on behalf of Dr. Foster. He explained that it was advantageous to wait to remove sutures until an abdom-

inoplasty was performed because at that time the sutures were fully exposed and easy to remove.

of 1984 that she was no longer a patient of his because of her unpaid bill. Ball claims that Dr. Foster abandoned her care and that she suffered injuries as a result thereof.

■ Abandonment is a recognized basis for liability of a physician to a patient. *Estate of Smith*, 387 N.W.2d at 579. If there was substantial evidence to support Ball's claim, the jury should have been instructed on it. It is a duty of a physician in taking charge of a case to follow the case and to give proper instructions to a patient as to his or her future acts and conduct. *Barnes*, 255 Iowa at 227, 122 N.W.2d at 315. When a physician takes charge of a case his employment continues until ended by mutual consent or his dismissal or until his services are no longer needed. A physician who leaves a patient in a critical stage of a disease without reason or sufficient notice to enable him to procure another physician is guilty of culpable dereliction of duty for which he is liable. *McGulpin v. Bessmer*, 241 Iowa 1119, 1127, 43 N.W.2d 121, 125 (1950).

Abandonment and lack of diligence in patient treatment are separate theories of medical malpractice. *Estate of Smith*, 387 N.W.2d at 576. At times these theories may be undistinguishable and will overlap, but what distinguishes abandonment from failure to meet the pertinent standard of care is that it requires an intent to terminate the professional relationship. *Id.*

■ Giving the evidence the most favorable construction it will reasonably bear in favor of submission to the jury, this court finds that Ball presented sufficient evidence with regard to whether Dr. Foster intended to terminate his physician-patient relationship with her. It was clear that Ball was not fulfilling her financial obligations to pay Dr. Foster's bill, and she and her daughter testified that a member of Dr. Foster's staff told Ball she was no longer a patient of Dr. Foster's because of her unpaid bill. Substantial evidence existed with regard to this aspect of an abandonment claim. However, a claim of abandonment requires more than a mere termination of a physician-patient relationship.

There must be evidence that the physician has terminated the relationship at a critical stage of the patient's treatment, that the termination was done without reason or sufficient notice to enable the patient to procure another physician, and that the patient is injured as a result thereof. *See McGulpin*, 241 Iowa at 1127, 43 N.W.2d at 125.

Ball presented no evidence demonstrating that she was at a critical stage of treatment at the time Dr. Foster allegedly severed his relationship with her in late August 1984. Dr. Foster testified that she had no serious medical problems as of her last visit with him on August 13, 1984. Dr. Posey saw Ball in October of 1984 and in January 1985 and he testified that at neither time did she have any serious medical problems requiring immediate medical attention. Even her own expert, Dr. Monson, could not testify that she needed immediate medical attention at the time he first saw her on January 28, 1985. He testified that Ball was admitted to the hospital at that time because "she wanted something done." This court feels that just as expert evidence is generally necessary to establish medical negligence, so it is also necessary to demonstrate by expert evidence that a patient was at a "critical stage" of medical care when his physician withdraws from his medical care. Ball has not presented such evidence in this case.

Likewise, there is insufficient evidence to establish that Ball could not acquire sufficient medical care after Dr. Foster allegedly terminated his care for her. She subsequently had two visits with Dr. Posey and her daughter testified that they didn't attempt to schedule appointments with any Sioux City doctors other than Dr. Posey. Ball presented no evidence to demonstrate that she could not retain a bariatric specialist prior to her first visit with Dr. Monson in January 1985.

Ball failed to offer substantial evidence of her claim for abandonment. A directed verdict is appropriate in cases where *each element* of the claim is not supported by substantial evidence. *Oberreuter*, 398 N.W.2d at 209 (emphasis added). The trial

court did not err in directing a verdict on Ball's claim of abandonment.

AFFIRMED.

HABHAB, J., concurs.

HAYDEN, J., dissents.

HAYDEN, Judge (dissenting).

I respectfully dissent.

A synopsis of evidence and testimony before the jury is as follows:

Ball had a weight problem. She went to Foster who agreed to operate on her and follow her until she was completely cured. The operation was performed and Foster cut Ball from her solar plexis to her pubic hair line, right through the navel. The cut was deep, and cut all linings to the backbone. A 'black-fish cord line' was used to sew her up. Ball started to fester and has kept on festering to the present time. Her body reacted to and rejected the suture material. Holes appeared in Ball's incision line and the black string would come to the surface. The discharge was yellow at first and then turned green. Foster continued to look at, but do virtually nothing to remove any lumps and stitches. Ball's condition continued to get worse. Because it was unbearable, Ball and her daughter went to Foster's office and were told, 'You are no longer a patient; you haven't paid your bill; don't come back.' Ball tried, repeatedly, to get an appointment with Foster, and he refused to see her or treat her any more. Ball continued to drain, smell and lose weight and Ball had to leave the city of Sioux City to go to Dr. Monson in Omaha (hereinafter referred to as Monson). Monson cut out the lumps (containing the black fish cord) and that area would heal and another spot would erupt (because the entire stomach area was infected). Pain, smell, drainage and infection has been decreased by Monson. If the lumps would have been opened and the string removed the recovery of Ball would have been relatively simple and uneventful. Foster acknowledged that he contracted to operate and follow up Ball until she was free of infection. Ball suffered because of Foster's refusal to follow up on the surgery.

I determine there is substantial evidence to support Ball's claim Dr. Foster abandoned her and terminated his treatment of her before she was healed from Dr. Foster's surgery. I acknowledge this evidence and testimony is not presented entirely by expert witnesses. Dr. Monson's testimony sheds light on whether Ball's surgery had healed when he started treating her after Dr. Foster refused to see or treat her. Ball testified that a member of Dr. Foster's office staff told her, "You are no longer a patient; you haven't paid your bill; don't come back" after Dr. Foster had failed to remove the non-absorbible sutures used in the operation, which were causing either infection or a foreign body reaction.

When a physician takes charge of a case his (or her) employment continues until ended by mutual consent or his (or her) dismissal or until his (or her) services are no longer needed. *McGulpin v. Bessmer*, 241 Iowa 1119, 1127, 43 N.W.2d 121, 125 (1950). If there is substantial evidence to support the plaintiff's claim, the jury should have been instructed on the issue of abandonment. *Smith v. Lerner*, 387 N.W.2d 576, 579 (Iowa 1986). The relationship of physician and surgeon and patient is one arising out of contract, express or implied. 70 C.J.S. *Physician and Surgeon* § 59 (1987).

For the above reasons and authorities, I respectfully dissent from the majority's opinion. I would hold the trial court erred in sustaining Dr. Foster's motion for a directed verdict as to Ball's counterclaim. I determine there was sufficient evidence to submit this issue to the jury. A jury question was generated as to defendant's counterclaim Dr. Foster had abandoned her.