Michael J. MANNO, Executor
of the Estate of Raymond
A. Mitchell, Appellee,

v.

Thomas J. McINTOSH, M.D., and Nile
S. Dusdieker, M.D., Appellants.

No. 92–1536.

Court of Appeals of Iowa.

April 26, 1994.

Raymond R. Stefani and Thomas F. Ochs of Gray, Stefani & Mitvalski, Cedar Rapids, for appellants.

Thomas D. Hanson and Barry A. Russell of Hanson, Bjork & Russell, Des Moines, for appellee.

Heard by OXBERGER, C.J., HABHAB, J., and McCARTNEY, Senior Judge,* but decided by DONIELSON, C.J., and HAYDEN, SACKETT, HABHAB, CADY, and HUITINK, JJ.

HABHAB, Judge.

In this medical malpractice action the defendant doctors, Dr. Thomas McIntosh and Dr. Nile Dusdieker, appeal the district court's granting of plaintiff's motion for a new trial after a jury found the doctors free from fault in the death of the decedent, Raymond A. Mitchell. We reverse and remand.

Raymond Mitchell was a seventy-year-old retired farmer who had a history of medical conditions related to arthritis, high blood pressure, urinary frequency and diabetes. Mitchell had been suffering for approximately one week from "flu symptoms, nausea, and heartburn," and also exhibited some symptoms of jaundice (yellowness in his eyes and skin), but had refused to enter the hospital. On December 24, 1988, Mitchell was admitted into Grinnell General Hospital under the care of Dr. Gannon and Dr. Light for intestinal problems. On December 31, 1988, Mitchell was transferred to Mercy Hospital in Cedar Rapids under the care of Dr. McIntosh. Dr. McIntosh subsequently brought Dr. Dusdieker in as a consultant.

That same night, decedent's daughter Joellen, who is an orthopedic physician's assistant, telephoned Dr. McIntosh and told him an angiogram and CT scan should be performed on her father. She also told Dr. McIntosh her father may have a thrombosis which may require surgery. Joellen informed Dr. McIntosh her comments were based upon a conversation she had with a family friend and physician, Dr. Drew Elgin, a practicing gastroenterologist. At trial, Dr. McIntosh testified he considered what Joellen had told him, but found surgery was not an appropriate course of action at that time.

Dr. Dusdieker, a gastroenterologist, first examined Mitchell on the afternoon of January 2, 1989. Dr. Dusdieker wrote orders and directed Mitchell's care at that point. Dr. McIntosh testified he was no longer in charge of the patient after January 3.

Dr. Dusdieker continued to run tests on Mitchell. He had several "working" diagnoses, one which was the possible diverticulitis of the colon. He ordered a CT scan on January 4, which showed the presence of a partial clot. Dr. Dusdieker consulted surgeon Dr. Bruce Brown concerning the possibility of surgery. Dr. Brown agreed with Dr. Dusdieker's decision to manage Mitchell's condition medically.

Dr. Dusdieker attended a seminar in Arizona from January 7 to 11, 1989. It is undisputed that during Dr. Dusdieker's absence, Mitchell was cared for and seen by numerous medical personnel, including four doctors.

On January 11, Dr. Brown determined an exploratory laparotomy was necessary and on January 12, Dr. Brown performed the surgery on Mitchell. During the surgery, Dr. Brown discovered a segment of diverticulosed colon, which was removed. Mitchell subsequently died from complications associated with diverticulitis.

The executor of the decedent's estate brought suit against four doctors: Dr. McIntosh, Dr. Dusdieker, Dr. Richard Gannon and Dr. Henry Light. The plaintiff alleged the four doctors were each negligent in the care of the decedent in several particulars, including their failure to diagnose the diverticulitis. The plaintiff also claimed Drs. McIntosh and Dusdieker were guilty of abandoning Mitchell's treatment. Prior to trial, the plaintiff settled with Dr. Light and released him as a named defendant.

During trial, the court refused to admit evidence regarding the conversation between

* Senior judge from the 2nd Judicial District serving on this court by order of the Iowa Supreme Court.

Joellen and Dr. Elgin. The trial court determined evidence of the conversation was inadmissible hearsay.

At the close of the plaintiff's case, the trial court granted Dr. Gannon's motion for directed verdict as to the negligence claims against him.[1] At the close of all the evidence, the court granted Drs. McIntosh and Dusdieker's motions for directed verdict on the abandonment claims and on the claims for punitive damages. The court refused to instruct the jury as to plaintiff's claim the nondefendant doctors who covered for Drs. McIntosh and Dusdieker were acting as their apparent agents. Under this theory, plaintiff claims Drs. McIntosh and Dusdieker would be liable for any medical malpractice these covering doctors may have committed.

The jury returned a verdict finding the decedent to be seventy-eight percent at fault. It found no fault on the part of Drs. McIntosh, Dusdieker or Light.

The plaintiff filed a motion for new trial. The trial court found evidence of the conversation between Joellen and Dr. Elgin should have been presented to the jury. It determined the evidence was admissible hearsay pursuant to Iowa Rule of Evidence 803(24). It also determined it erred in granting the defendants' motions for directed verdict on the abandonment claims.

In addition, the court determined the jury had engaged in misconduct by using a quotient verdict to determine the comparative fault percentages. The court based this finding on a piece of paper it found which had been used by the jury. The paper appeared to contain the calculations for a quotient verdict. The court determined the possibility of a quotient verdict, coupled with the other errors required a new trial. Drs. McIntosh and Dusdieker appeal. The plaintiff cross-appeals claiming the court erred in refusing to submit its proposed agency instruction.

In ruling upon motions for new trial the trial court has a broad but not unlimited discretion in determining whether the verdict effectuates substantial justice between the parties. Iowa R.App.P. 14(f)(3). We are slower to interfere with the grant of a new trial than with its denial. Iowa R.App.P. 14(f)(4). We will only do so when it is reasonably clear there was an abuse of discretion. *Northrup v. Miles Homes, Inc.*, 204 N.W.2d 850, 861 (Iowa 1973).

## I. *Admissibility of Dr. Elgin's Deposition.*

At trial, the plaintiff sought to have certain testimony from the deposition of Dr. Elgin admitted. The district court found the proffered testimony to be inadmissible hearsay. In its motion for a new trial, plaintiff claimed the testimony was either not hearsay, or if it was hearsay, it came within one of three recognized exceptions to the hearsay rule. When ruling on plaintiff's motion for new trial, the district court found the challenged testimony was hearsay, but that it should have been admitted because it met the criteria for admission under Iowa Rules of Evidence 803(24), the "catch-all" exception.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Plaintiff claimed at trial,[2] and now as an alternate grounds on appeal, that Dr. Elgin's deposition was not hearsay because it was not being offered for the truth of the matter asserted, but only to show that the defendants had notice of the need for further diagnostic testing. Plaintiff also argues Dr. Elgin's testimony was offered to explain Joellen's conduct in telephoning Dr. McIntosh on December 31, 1988. Plaintiff claims Joellen's telephone conversation with Dr. McIntosh led to the abandonment of Mitchell by Dr. McIntosh.

Dr. Elgin's deposition explains what he and Joellen spoke about on December 31,

---

1. The court ruled there was not sufficient proximate cause to justify submission of plaintiff's claim against Dr. Gannon. That ruling is not an issue in this appeal.

2. Defendants argue that plaintiff sought to offer Dr. Elgin's telephone responses to Joellen's descriptions of Mitchell's condition in order to prove that Dr. McIntosh and/or Dr. Dusdieker in Dr. Elgin's opinion should have ordered additional diagnostic testing and did not do so.

1988. However, Dr. Elgin lacks any personal knowledge of what Joellen told Dr. McIntosh. He therefore has no personal knowledge of what notice Joellen gave Dr. McIntosh.

Both Dr. McIntosh and Joellen testified about their telephone conversation on December 31, 1988. Both testified Joellen told Dr. McIntosh that more diagnostic tests were necessary including an angiogram and a CT scan, and that Mitchell possibly had blood clots and might need surgery. Dr. McIntosh testified Joellen informed him that her information was based on her conversation with a physician friend. We find Dr. Elgin's confirmation of what he told Joellen on December 31, 1988, has little, if any, probative value on what notice Joellen gave Dr. McIntosh or why Dr. McIntosh allegedly abandoned Mitchell.

We agree with the district court that Dr. Elgin's testimony was hearsay. The purpose of the plaintiff offering the deposition was to prove that Dr. Elgin was correct in believing a CT scan or other diagnostic testing, or perhaps surgery was needed on or around December 31, 1988, and therefore the defendants were negligent in not performing them until January 4, 1989.

We also agree with the district court the evidence did not fall under the hearsay exceptions of Iowa Rules of Evidence 803(1), (3) or (4). We now examine whether the district court was correct in finding it fell under Rule 803(24), the "catch-all" exception:

Iowa Rule of Evidence 803(24) states in part:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice

will best be served by admission of the statement into evidence.

In *State v. Brown*, 341 N.W.2d 10, 14 (Iowa 1983), our supreme court found it important to note the admonishment issued by the congressional committee that authored the federal counterpart to 803(24):

It is intended that the residuary hearsay exceptions will be used very rarely and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in Rule 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions.

*Brown*, 341 N.W.2d at 14 (quoting 28 U.S.C.A. Rule 803, Historical Note at 583).

Before hearsay evidence can be admitted pursuant to this rule, the trial court must determine that the conditions of the rule are met. This requires five specific findings by the trial judge (trustworthiness, materiality, necessity, notice, and service of the interests of justice). *Id.* These findings should be made explicitly on the record. *Id.* We find materiality and necessity have not been met.

The district court states the proffered deposition testimony was material because "Dr. Elgin was offering the same testimony of material facts that he could have relied upon had he been testifying as an expert." The district court found proffered testimony was necessary because it was "his advice given to Joellen by way of various telephone conversations made between them. His testimony as to what his response was is certainly more probative on this point than any other method or means."

As stated previously, we find Dr. Elgin's testimony about how he advised Joellen on December 31, 1988, has little probative value because he has no personal knowledge of what Joellen told Dr. McIntosh. Dr. Elgin also has no personal knowledge of the defendant doctors' diagnosis and treatment of Mitchell.[3]

---

3. Defendants in their initial brief contend that if an explanation for Joellen's conduct is relevant

to any issues properly before the jury, such explanation was supplied through her testimony.

Dr. Elgin's testimony may be relevant as to whether additional testing was required by Dr. McIntosh on December 31, 1988, to meet the applicable standard of care.[4] However, because Dr. Elgin has no personal knowledge, and he specifically arranged "to testify as a nonexpert witness" we find his testimony on this point is not more probative than other evidence which plaintiff could procure through reasonable efforts. In fact, the plaintiff had a medical expert, Dr. Marshall Orloff, who testified on this issue.

We find the district court, when granting the motion for a new trial, erred in finding Dr. Elgin's depositional testimony was admissible under Iowa Rules of Evidence 803(24).

## II. *Abandonment.*

■ We now examine whether Drs. McIntosh and Dusdieker were entitled to a directed verdict on the abandonment claims.

■ Abandonment is a recognized basis for liability of a physician to a patient. *Surgical Consultants, P.C. v. Ball,* 447 N.W.2d 676, 682 (Iowa App.1989). If there was substantial evidence to support the plaintiff's claim, the jury should have been instructed on the issue of abandonment. *Estate of Smith by Smith v. Lerner,* 387 N.W.2d 576, 579 (Iowa 1986).

■ It is the duty of a physician in taking charge of a case to follow the case and to give proper instructions to a patient as to his or her future acts and conduct. *Surgical Consultants,* 447 N.W.2d at 682. When a physician takes charge of a case, his employment continues until ended by mutual consent or his dismissal or until his services are no longer needed. *Id.* A physician who leaves a patient in a critical stage of a disease without reason or sufficient notice to enable him to procure another physician is guilty of a culpable dereliction of duty for which he is liable. *Id.*

The abandonment of, and the lack of diligence in, patient treatment are separate theories of medical malpractice:

Abandonment ... in its classical sense, involves an intent on the part of the physician to terminate ... the contractual relationship. However, closely related to it is the situation in which there is no such intention by the physician, but he is so dilatory in his obligation that he does not see the patient as often as due care in treatment would demand and the patient is thus denied the benefit of the physician-patient relationship. To further differentiate, classical abandonment gives rise not only to an action for negligence, but one for breach of contract. Malpractice involving treatment which results either from failure to see the patient sufficiently often or from an incorrect conclusion that the patient's condition is such that no further treatment is necessary involves an action in negligence alone.

*Lerner,* 387 N.W.2d at 576 (quoting Angela R. Holder, *Medical Malpractice Law* 374 (2d Ed.1978) (footnotes omitted)).

At times these theories may be indistinguishable. Abandonment does not require an express declaration by the physician that he does not intend to see the patient further. *Id.* A physician's failure to see the patient at intervals necessary for proper treatment may also be considered abandonment. *Id.*

Therefore the simple failure to see a patient when necessary may, in the first place constitute abandonment, and in the second it may be negligence in terms of the standard of care of both diagnosis and treatment owed to the patient. If the physician had been properly attentive he might well have known what was wrong with the patient and treated it properly. Thus, even if a physician comes back to see the patient, if he has unreasonably refused

---

Joellen correctly recited what she observed during the paracentesis (presumably the same information she reported to Dr. Elgin while assisting Dr. McIntosh with the procedure). The information Joellen obtained from Dr. Elgin was before the jury.

4. Plaintiff additionally contends that Dr. Elgin's deposition testimony was necessary to set the stage for the preliminary examination of Dr. Orloff's testimony, plaintiff's expert. Dr. Orloff opined there was no proof that Mitchell suffered from the very condition—a mesenteric venous thrombosis—that so concerned Dr. Elgin.

to come at the time when the patient needs him, he may well have been so negligent as to be held to have abandoned his patient. The longer the delay, of course, the more likely that a court will find abandonment.

*Id.* (quoting Holder at 376 (footnotes omitted)).

Thus what distinguishes abandonment from failure to meet the pertinent standard of care is that it requires an intent to terminate the professional relationship. *Id.*

■ To prove abandonment, a plaintiff patient must prove more than a mere termination of a patient-physician relationship. *Surgical Consultants,* 447 N.W.2d at 682. There must be evidence that the physician has terminated the relationship at a critical stage of the patient's treatment, the termination was done without reason or sufficient notice to enable the patient to procure another physician, and the patient is injured as a result thereof. *Id.* Expert evidence is generally required to establish the plaintiff was at a critical stage of medical care when defendants allegedly withdrew medical treatment. *Cox v. Jones,* 470 N.W.2d 23, 26 (Iowa 1991).

Plaintiff's abandonment claim against Dr. McIntosh is based on Dr. McIntosh not seeing Mitchell after January 3, 1989. Dr. McIntosh says it was his understanding that he was dismissed by Mitchell's representative, Joellen, on that date. Dr. McIntosh also testified:

I accepted the patient with Joellen's understanding that Dr. Dusdieker would begin to see the patient when he returned to town two days later. Once I had discussed the care of the patient with Dr. Dusdieker and he agreed to take—to accept the patient in consultation and direct the care, then I bowed to his additional skills and my services would be superfluous.

Dr. McIntosh testified Joellen agreed to Dr. Dusdieker being the gastroenterologist on this case. Joellen testified Dr. McIntosh informed her Dr. Dusdieker was going to assume care when he returned on January 2. Joellen also stated Dr. Dusdieker informed her he was assuming her father's care.

Plaintiff has failed to offer substantial evidence as to the claim for abandonment against Dr. McIntosh. A directed verdict is appropriate in cases where each element of the claim is not supported by substantial evidence. *Id.*

■ The plaintiff's abandonment claim against Dr. Dusdieker is based on his leaving Mitchell from January 6 to January 11, 1989, to attend a medical conference. Dr. Dusdieker, a gastroenterologist, left Mitchell in the care of his associate, Dr. Anne Voights. Dr. Voights is physician-trained and board-certified in both internal medicine and nephrology. On January 11, it was determined an exploratory laparotomy should be done. Dr. Dusdieker returned the morning of January 12, and resumed Mitchell's care. The surgery was done that afternoon.

Defendant Dusdieker argues there could not have been an abandonment because he arranged for a substitute physician to care for Mitchell in his absence. Dr. Dusdieker testified he had told Mitchell and Mitchell's family he would be unavailable for five days. Joellen testified she did not recall Dr. Dusdieker informing her he would be out of town.

The question before us is one of first impression in Iowa. If a physician temporarily leaves or interrupts his practice can he be liable for abandonment, if before doing so he arranges for another physician to take his place?

Generally, when a patient is still in need of medical attention, the chosen physician may not substitute another physician, without any notice to, or agreement with, the patient involved, except in the case of an emergency. *Miller v. Dore,* 154 Me. 363, 367, 148 A.2d 692, 695 (1959); *Stohlman v. Davis,* 117 Neb. 178, 183–84, 220 N.W. 247, 250 (1928); *Bolles v. Kinton,* 83 Colo. 147, 149, 263 P. 26, 27 (1928).

However, most jurisdictions have found a defendant doctor has not abandoned his patient if he either arranges for a competent substitute, or if he notifies the patient he will be unavailable in a reasonable time to allow the patient to engage another doctor. *Kenney v. Piedmont Hosp.,* 136 Ga.App. 660, 663,

222 S.E.2d 162, 166 (1975); *Lee v. Dewbre*, 362 S.W.2d 900, 903 (Tex.Civ.App.1962); *but see, Howell v. Biggart,* 108 W.Va. 560, 563–64, 152 S.E. 323, 324 (1930) (physician had not provided competent substitute when physician did not inform plaintiff another physician would care for her and plaintiff would have only been able to discover arrangement casually or by chance).

We find plaintiff has failed to provide sufficient evidence to create a jury question on whether Dr. Dusdieker intended to abandon Mitchell. Mitchell was never without medical care. Plaintiff has not presented evidence that Dr. Voights was an inappropriate substitute. Dr. Dusdieker wrote a lengthy summary note for Dr. Voights to use as a "plan" for therapy of Mitchell. In addition to Dr. Voights, Dr. Lindo, Dr. Galbraith and Dr. Brown treated Mitchell during Dr. Dusdieker's absence. On January 11, Dr. Brown decided a laparotomy was necessary so he scheduled the surgery for the next day. Dr. Dusdieker returned on the morning of January 12, and examined Mitchell before his surgery.

We find the trial court was correct in the first instance when it ruled that Dr. McIntosh and Dr. Dusdieker were entitled to a directed verdict on the abandonment claims. We find the district court erred in basing its grant of a new trial on its belief this issue should have been submitted to the jury.

### III. *Quotient Verdict.*

■ The defendants next argue the district court erred in finding the alleged jury misconduct combined with other errors required a new trial.

In delivering its verdict the jury answered "No" to the special interrogatories asking whether either Dr. McIntosh or Dr. Dusdieker was at fault. It answered "Yes" to whether Raymond Mitchell was at fault and whether his fault was a proximate cause of his injuries. However, in its assessment of the percentage of fault it initially assigned fault as follows: zero percent to Dr. Light; eleven percent to Dr. McIntosh; eleven percent to

defendant Dr. Dusdieker; and seventy-eight percent to Raymond Mitchell.

Because of the inconsistencies in the verdict with respect to the jury's assessment of fault, the trial court addressed the jury and requested it to reconsider. After this exchange the jury retired to the jury room and then returned a revised verdict form which assessed zero percent fault against all defendants and seventy-eight percent fault against Raymond Mitchell.[5]

On August 19, 1992, three months after plaintiff's motion for a new trial had been filed but prior to the ruling, the trial court contacted counsel for plaintiff and defendants to advise he had discovered, on the back of a jury note to the trial judge, a column of figures, a total for the figures and the figure "78%." The trial court believed the note was evidence the jury had arrived at a "quotient verdict" in assessing fault against plaintiff's decedent, in spite of the trial court's express instruction to the contrary. In its ruling on plaintiff's motion for a new trial, the trial court found the possibility of the quotient verdict tainted the verdict, and this coupled with its rulings discussed in Division I and II above, required a new trial.

■ A quotient verdict is "a verdict in which the jurors agree in advance to be bound by the average of the amounts written down by each juror. *Ryan v. Arneson,* 422 N.W.2d 491, 493 (Iowa 1988). While it is improper for the jury to agree to be bound by an average, it is not improper for a jury to use an average as an aid in discussion. *Id.*

The jury was instructed it was not to use a quotient verdict to arrive at a verdict. A jury is presumed to obey instructions. *Hoekstra v. Farm Bureau Mut. Ins. Co.,* 382 N.W.2d 100, 110 (Iowa 1986). The only evidence to support the conclusion that the jury relied on a quotient verdict was the figures written on the back of a note to the trial judge. The note itself did not establish jury misconduct.

In addition it cannot go unnoticed that the jury found each defendant to be without fault. Under this circumstance, even if we

---

**5.** We recognize the jury verdict did not equal 100%, however, plaintiff did not lodge a complaint to this at the time the verdict was returned nor has it been assigned as error on appeal.

were to assume the jury wrongfully employed a quotient verdict, we fail to see how the plaintiff was prejudiced.

When we consider this issue, along with the issues discussed in Division I and II, we conclude a new trial is not required and that the trial court abused its discretion in granting one.

## IV. *Agency Theory.*

■ In his cross-appeal, plaintiff claims the district court erred in refusing to submit plaintiff's requested agency instruction to the jury. Plaintiff argues an agency relationship or an apparent agency relationship existed between Drs. McIntosh, Dusdieker, Voights and Brown.

The proposed jury instruction read:

You are instructed that generally a person who engages the services of an independent contractor is not liable for the negligent acts of said independent contractor; however, even if you should find that the physician is an independent contractor, the defendant may still be liable under the doctrine of apparent or ostensible agency if the following factors are found to be supported by the evidence:

1. that the defendant provided Raymond Mitchell with the treating physician; and

2. that Raymond Mitchell had no opportunity to be referred to another treating physician.

The district court did submit plaintiff's instruction on joint liability. That instruction stated:

In some circumstances joint liability may be imposed on two or more physicians who act in concert to treat a patient. If two or more physicians are engaged independently and act jointly to treat the same patient, each of them may be liable for the fault of the other which he observes and allows to continue without objection, or which he should have observed in the exercise of reasonable diligence under the circumstances.

■ Jury instructions are designed to explain the applicable law to the jurors so the law may be applied to the facts proven at trial. *State v. Freeman,* 267 N.W.2d 69, 71

(Iowa 1978). Submission of issues that have no support in the evidence to the jury is error. *W.T. Rawleigh Medical Co. v. Bane,* 181 Iowa 734, 739, 165 N.W. 42, 43–44 (1917); *accord Borough v. Minneapolis & St. L.R. Co.,* 191 Iowa 1216, 1223, 184 N.W. 320, 323 (1921); *see Miller v. International Harvester Co.,* 246 N.W.2d 298, 301 (Iowa 1976). Conversely, failure to submit issues that are supported by substantial evidence also is error. *See Borough,* 191 Iowa at 1223, 184 N.W. at 323; *see also Miller,* 246 N.W.2d at 301. A corollary to these rules is that the trial court has a duty to ensure that the jury understands the law it must apply. *Sanders v. Ghrist,* 421 N.W.2d 520, 522 (Iowa 1988). In evaluating this, we must read all of the instructions together, not piecemeal or in artificial isolation. *Id.; Clinton Land Co. v. M/S Assoc., Inc.,* 340 N.W.2d 232, 234 (Iowa 1983). We must reverse and order a new trial if the instructions as a whole are insufficient to convey the applicable law. *Sanders,* 421 N.W.2d at 522 (citing *Adam v. T.I.P. Rural Elec. Coop.,* 271 N.W.2d 896, 900–01 (Iowa 1978)).

■ Our supreme court has recognized agency as a theory of recovery in the context of medical malpractice actions. *See Wiles v. Myerly,* 210 N.W.2d 619, 631 (Iowa 1973). A physician is liable for the negligence or malpractice of another physician or surgeon acting as his agent, employee or assistant. *Id.; Whitmore v. Fabi,* 155 Mich.App. 333, 338–39, 399 N.W.2d 520, 523 (1986). However, a physician who calls in or recommends another physician or surgeon is not liable for the other's malpractice, at least where there was no agency or concert of action, or no negligence in the selection of the physician or surgeon. *Powers v. Scutchfield,* 137 Ind. App. 211, 216, 205 N.E.2d 326, 329 (1965); *Mincey v. Blando,* 655 S.W.2d 609, 612 (Mo. Ct.App.1983); *Reed v. Bascon,* 124 Ill.2d 386, 394–95, 125 Ill.Dec. 259, 263, 530 N.E.2d 417, 421 (1988). The same is true where a physician, being unable to care for a patient, sends a substitute. *Reed v. Gershweir,* 160 Ariz. 203, 204, 772 P.2d 26, 27 (Ct.App.1989); *Kavanaugh v. Nussbaum,* 71 N.Y.2d 535, 538, 523 N.E.2d 284, 288–89, 528 N.Y.S.2d 8, 12–13 (1988).

824

We find the proposed jury instruction was not supported by the evidence. The district court properly refused to submit plaintiff's requested "apparent agency" instruction.

Costs of this appeal are assessed to plaintiff-appellee.

**REVERSED AND REMANDED WITH INSTRUCTIONS TO DISMISS.**